STATE OF TEXAS V. INTERNATIONAL & GREAT NORTHERN
RAILROAD COMPANY.

Decided January 14, 1903.

**Carrier—Compressing Cotton in Transit—Railroad Commission—Foreign Shipment.**

Owners of cotton, destined by them for shipment to foreign ports, applied to a railway for foreign bills of lading over its road and defendant's connecting line to Galveston, with directions to compress it at Palestine, where it reached such connecting line and where they were operating a compress. This being refused they took bills of lading to Galveston, with directions to transport "flat," that is, without compressing, and at Palestine exchanged these for foreign bills of lading by defendant, and had the cotton compressed there in disregard of the rules of the Railroad Commission as to compressing cotton in transit. Held, that the shipment was a foreign one, despite the form of the original bill of lading, and not subject to state regulations as to compressing.

Appeal from the District Court of Travis. Tried below before Hon. F. G. Morris.

*C. K. Bell,* Attorney-General, and *T. S. Reese,* Assistant Attorney-General, for appellant.

*N. A. Stedman,* for appellee.

STREETMAN, ASSOCIATE JUSTICE.—The State of Texas brought this suit by her Attorney-General, under the direction of the Railroad Commission, for penalties on account of certain alleged violations of the regulations adopted by said commission and certain discriminations in freight charges.

The regulations were as follows:

"Section 3.—Rules and Regulations.—First. A shipper desiring his cotton to be delivered at destination uncompressed, shall give to the railroad company notice of such desire by inserting in his bills of lading the notation 'to go through uncompressed,' or other plain words of similar import; and it shall be the duty of the railroad company accepting such shipment to make delivery at destination accordingly.

"Second. A shipper desiring his cotton delivered at destination com- pressed shall, when no compress is in operation at shipping point, give to the railroad company notice of such desire by inserting in his bills of lading the notation 'to be compressed in transit,' and it shall be the duty of the railroad company accepting the shipment to comply with such instructions if there be an accessible compress at which such cotton can be compressed under the provisions of this section. The railroad companies shall make an allowance of five (5) working days, within which the compress companies shall receive, compress and redeliver to the railroad companies, cotton which is to be compressed in transit; but in the event of the failure of a compress company to perform all of such work within the time thus fixed, it shall be the privilege of the railroad

company, upon whose line such compress is situated to report such fail-
re to the Railroad Commission and ask exemption from the obligation
to place further shipments of 'transit' cotton with such compress com-
pany until it shall be in condition to comply with this requirement.

"Third.  Railroad companies shall assume the cost of compressing
cotton which is to be delivered at destination compressed only on the
following conditions:

"1.  Cotton shall be compressed at shipping point when an accessible
compress is in operation at such point.

"2.  When no compress is in operation at shipping point the cotton
shall be compressed at a station directly intermediate between shipping
point and destination and distant seventy (70) miles or more from such
destination.  Compresses being in operation at two or more stations
directly between shipping point and destination, the compress nearest
to shipping point shall be selected to compress such cotton; provided,
that cotton to be compressed in transit may, at the option of the railroad
company and without additional expense to the shipper or owner of the
cotton, be hauled back to and compressed at a compress which is nearer
to the point of origin than is the first compress in the direct route to
destination, if such nearer compress be in operation upon the line of
road upon which such cotton originates; and further provided, that
when cotton is offered for shipment at a junction point of two or more
competing lines of railroad, at which no compress is in operation, con-
ditioned upon such cotton being compressed at another junction point
of such competing lines in the direction of final destination, and it is
possible for one of such competing lines to comply with such condition
under the foregoing rules, then the other competing lines interested
shall have the privilege of accepting and transporting such shipment of
cotton upon the same condition, although it may be necessary for such
other lines, in doing so, to haul such cotton through intermediate com-
press points on their lines.  This proviso shall not be construed as ap-
plying on cotton originating at other points between such junction
points.

"3.  The amount of the cost of compressing assumed by railroad com-
panies shall not exceed ten (10) cents per 100 pounds out of rates that
are not less than 40 cents per 100 pounds between stations subject to
rates prescribed in table of rates, section 1, of this tariff, nor less than
40 cents per 100 pounds to Houston from points specified in exceptions,
section 2 of this tariff. When rates between such stations are less than
40 cents, but greater than 30 cents per 100 pounds, the railroad com-
panies shall assume only so much of the cost of compressing as will,
when added to 30 cents, make up the amount of the current freight
rate."

It was alleged, that, while said regulations were in force, a firm of
Heineken & Vogelsang delivered to the St. Louis & Southwestern Rail-
way Company, at Gilmer, Texas, a station on said road, 507 bales of
cotton to be shipped to their own order at Galveston, Texas, by way of

the said St. Louis Southwestern Railway, from Gilmer to Tyler, Texas, and from Tyler to Galveston over defendant's railway, and caused it to be noted in the bills of lading therefor that said cotton was to go "through flat," which meant that it was to be carried to Galveston without being compressed.

That there were compreses willing and able to compress said cotton at Tyler, Texas, and at Jacksonville, Texas, both on the route of said defendant railway company between Gilmer and Palestine, and more than 70 miles from Galveston.

That the defendant received said cotton from the St. Louis Southwestern Railway Company at Tyler, Texas, and carried the same uncompressed by the compresses at Tyler and Jacksonville; but in violation of said direction in said bill of lading said defendant stopped said cotton and had same compressed at Palestine, Texas, and then carried the same to Galveston, and that said defendant paid the charges of said compress at Palestine for pressing said cotton.

It was further alleged that about the same time W. O. Boyd delivered to the St. Louis Southwestern Railway Company at Gilmer, Texas, 41 bales of cotton to be shipped to Galveston in the same manner and with the same notation in the bills of lading, and that said railway companies carried said 41 bales through to Galveston uncompressed.

That the freight rate charged on said two shipments was the same, and the defendant by compressing the said 507 bales of cotton at its own expense and not performing the same service for the shipper of said 41 bales was guilty of an unjust discrimination in favor of the shippers of said 507 bales.

The defendant in answer alleged substantially the facts hereinafter set out, and claimed that the shipment was not in fact an interstate shipment but a foreign shipment, which was not subject to the laws of Texas, or the regulations of its Railroad Commission.

The facts with reference to the shipment of 41 bales of cotton by Boyd were proved as alleged.

With reference to the other shipment the facts were substantially as follows:

Heineken & Vogelsang through their agent N. J. Nagle had bought at Gilmer, Texas, 507 bales of cotton. The cotton was bought for foreign markets, and before it was shipped they had determined to ship it to foreign ports, as follows: 107 bales to Bremen, Germany; 100 bales to Antwerp, Belgium; 200 bales to Milan, Italy, via Genoa, Italy; 100 bales to Naples, Italy. Heineken & Vogelsang were running a compress at Palestine, Texas, and for said reason wanted said cotton compressed at that place.

They first requested the St. Louis Southwestern Railway Company to give them foreign bills of lading to the places above named, with the direction that said cotton was to be compressed at Palestine. This was refused, and said firm then directed the said railway company to give them bills of lading for said cotton from Gilmer, Texas, to Galveston,

Texas, with the notation in the bills that the cotton was to go through "flat," which was accordingly done, on January 3, 1902.

Heineken & Vogelsang at once began negotiations with the defendant railway company, the result of which was that when the cotton reached Tyler, Texas, and was delivered to the defendant the original bills of lading were surrendered and foreign bills issued for the shipment to the various foreign destinations above named.

The cotton was then carried to Palestine, Texas, passing the compress at Jacksonville, and was stopped and compressed at Palestine, defendant paying the compress charges. It was then carried in continuous course of shipment to Galveston, Texas, and thence to the several foreign destinations named.

The defendant was shown to have been engaged for a number of years in the business of acting as one of the connecting carriers in connection with other carriers in making foreign shipments, and in making contracts for such shipments, and it was shown that it made the shipment in question in the usual course of its business as such carrier.

The District Court rendered judgment for defendant, from which the State has appealed.

The decision of our Supreme Court in the case of Houston Navigation Company v. Insurance Company of North America, 89 Texas, 1, is conclusive upon the question involved. Associate Justice Brown in that case says:

"The law applicable to this case, deducible from the decisions of the courts, may be thus stated: When a commodity has been delivered to a common carrier, to be transported on a continuous voyage or trip to a point beyond the limits of the State where delivered, the character of interstate or foreign commerce attaches thereto." Citing Coe v. Errol, 116 U. S., 517; The Daniel Ball, 10 Wall., 557; Ex parte Koehler, 30 Fed. Rep., 867; In re Greene, 52 Fed. Rep., 113; Railway v. Sherwood, 84 Texas, 125.

In the same case, which involved a shipment under very similar conditions to those in question, it is said: "The questions to be determined are: Did the cotton in question when delivered to the navigation company start on its journey outside of the State of Texas? Was its destination at that time fixed and determined upon, and was the carriage from Houston to Galveston a part of the voyage which was to be continuous?"

Applying these tests to the shipment in this case we must conclude that it was a foreign shipment and not subject to the commission regulations.

This court has formerly held that the form of the bill of lading does not determine the character of the shipment. State v. Railway Co., 49 S. W. Rep., 252; State v. Railway Co., 44 S. W. Rep., 542.

Finding no error in the judgment, it is affirmed.

*Affirmed.*

Writ of error refused.