# TEXAS & NEW ORLEANS RAILROAD COMPANY *v.* SABINE TRAM COMPANY.

ERROR TO THE COURT OF CIVIL APPEALS FOR THE FIRST
SUPREME JUDICIAL DISTRICT OF THE STATE OF TEXAS.

No. 93.    Argued December 17, 18, 1912.—Decided January 27, 1913.

Shipments of lumber on local bills of lading from one point in a State to another point in the same State destined from the beginning for export, under the circumstances of this case, are foreign and not intrastate commerce. *Southern Pacific Terminal* v. *Interstate Commerce Commission*, 219 U. S. 498; *Ohio Railroad Commission* v. *Worthington*, 225 U. S. 101, followed. *Gulf, Colorado & Santa Fe Ry.* v. *Texas*, 204 U. S. 403, distinguished.

Merchandise destined for export acquires the character of foreign commerce as soon as actually started for its destination or delivered to a carrier for transportation, *Coe* v. *Errol*, 116 U. S. 517, and while the transportation should be continuous it need not be by or through the initial carrier.

It is the nature of the traffic and not its accidents which determines whether it is intrastate or foreign.

Lumber ordered, manufactured and shipped for export, through a port where there is no local trade, held in this case to be foreign and not intrastate commerce although shipped on local bills of lading from a point in Texas to Sabine, Texas, and there shipped to its final destination by a vessel not designated before arrival and after waiting full time allowed on the wharves before shipment.

À continuous line of shipments through the same port to foreign ports, of merchandise in which there is no local trade, shows a continuity of transportation in which the delay and transshipment does not make any break that deprives it of its foreign character. *Swift & Co. v. United States*, 196 U. S. 375.

In this case *held* that shipments of lumber although on local bills were foreign commerce and subject only to the rates established by the railroads and filed with the Interstate Commerce Commission and that the railroad company was not subject to penalties for extortion for non-compliance with a rate established by the state law.


THE question in the case is whether shipments of lumber on local bills of lading from one point in Texas to another point in Texas, destined for export under the circumstances presently to be detailed, were intrastate or foreign commerce.

The action was brought by defendant in error, here called the Sabine Company, against the railroad companies (we shall so designate them unless it be necessary to distinguish them) to recover the sum of $1,788.33 alleged to be due for overcharges in freight on thirty-three cars of lumber shipped by the Sabine Company from Ruliff, in the State of Texas, to Sabine, in the same State, the shipments moving from the initial point to Beaumont over one of the roads and from Beaumont to Sabine over the other. It was alleged that the legal rate applicable to the shipments under the orders of the Railroad Commission of Texas was 6½ cents per hundred pounds and that the railroad companies collected, over the protest of the Sabine Company, 15 cents per hundred pounds under tariffs filed with the Interstate Commerce Commission, amounting to an illegal charge of 8½ cents per hundred

pounds. Recovery was also prayed for penalties for extortion under the laws of the State in the sum of $16,500.00, the maximum penalty of $500.00 per car load, upon the assumption that each car was a separate act of extortion, or the sum of $13,000.00 if shipment on different days should be adjudged to be separate acts.

The railroad companies defended on the ground that the shipments were foreign commerce and subject to a charge of 15 cents per hundred pounds and that such rate had been established by them and regularly filed with the Interstate Commerce Commission in accordance with the Act to Regulate Commerce.

The trial court charged against the defense and also that the freight charges collected having been paid in five separate payments, there were five distinct acts of extortion for which the Sabine Company was entitled to recover penalties in the sum of not less than $625.00 nor more than $2,500.00; that is, not less than $125.00 nor more than $500.00 for each act.

The jury returned a verdict for $1,788.33 as overcharges, with interest at 6% per annum from January 1, 1907, and $1,785.00 penalties. Judgment was entered on the verdict. A motion for a new trial was denied, and the case was then taken to the Court of Civil Appeals. There was a cross assignment of errors by the Sabine Company, complaining of the ruling of the trial court in finding that the company was only entitled to five penalties. It consented that if the assignment of errors be sustained the court could render judgment for the lowest penalty, $125.00. The court sustained the assignment and modified the judgment of the trial court and rendered judgment for penalties in the sum of $125.00 for twenty-four shipments, aggregating $3,000.00. A writ of error to review the judgment of the Court of Civil Appeals was denied and the judgment thereby becoming final, this writ of error was prosecuted.

The facts were found by the Court of Civil Appeals and are not in dispute:

"At the date of the transactions in question the Sabine Tram Company was engaged in the manufacture of lumber at its mill at Ruliff, a station in Texas on the line of the Texarkana & Fort Smith Railway Company. W. A. Powell Company, Limited, was engaged in buying lumber for export to different points in Europe, through the ports of Sabine and Port Arthur, both in the State of Texas. On August 28, 1906, having made sales to customers for future delivery in Europe of large amounts of heavy pine lumber, for the carriage of which steamships had in part already been chartered, to fill such contracts, W. A. Powell Co. bought of the Sabine Tram Company 500,000 feet of heavy pine lumber of certain dimensions, to be delivered during the months of September and October. The contract provided for delivery either in the water at Orange, Texas, or f. o. b. cars at Sabine, Texas, at the option of the seller. The seller exercised the option to deliver at Sabine, a station on the line of the Texas & New Orleans Railway. During the months of September and October the lumber purchased was delivered to the Texarkana & Fort Smith Railroad at Ruliff to be by it transported to Beaumont, the terminus of its line, and thence by connecting carrier, the Texas & New Orleans Railway, to Sabine and delivery to the Sabine Tram Company. There were 24 several shipments of the lumber on as many different days, the shipments embracing 33 cars, for which 30 separate bills of lading were executed by the Texarkana & Fort Smith road, for delivery at Sabine to the Sabine Tram Company, 'Notify W. A. Powell Company, Limited.' No other contract or arrangement was made by the Sabine Tram Company for the carriage of the lumber except that evidenced by the bills of lading aforesaid. Way-bills accompanied the shipments upon which were marked in pencil 'for export,'

but the Sabine Tram Company had no connection with, or knowledge of, the making of these way-bills, which was the act of the railway company alone. According to the course of dealing between the parties these bills of lading were endorsed by the Tram Company and sent through a bank to W. A. Powell Company, Limited, at New Orleans, La., attached to a draft for the price of the lumber, which being paid, the bills were delivered to Powell Company and by them transmitted to their agent Flanagan, at Sabine. In case of most of the shipments in question the bills of lading reached Flanagan at Sabine before the arrival of the lumber for which they were given. The lumber was carried under the shipping contracts or bills of lading aforesaid, by the Texarkana & Fort Smith road to Beaumont, and there delivered to the Texas and New Orleans road, by which it was carried to Sabine. Upon arrival at the station of Sabine it was, by direction of the agent of Powell Company carried without delay about a quarter of a mile beyond the station to the dock, where the lumber was to be unloaded. The lumber was unloaded from the cars into water of the slip in reach of ship's tackle, ready for loading onto ships. The Sabine Tram Company had no connection with this further carriage or switching of the lumber to the docks after its arrival at the station of Sabine, but this was done solely at the instance and under the direction of the agent of Powell Company. The transportation from Ruliff to Sabine was entirely within the State of Texas.

\* \* \* \* \* \* \* \*

"When the lumber had been switched to the docks, W. A. Powell Company, through their agent, presented the bills of lading, and demanded the lumber, offering to pay the freight charges which according to the course of dealing between the parties they were to pay for the Sabine Tram Company, who owed the same and which

it was to repay to Powell Company. The Texas & New Orleans Company, acting for itself and the Texarkana & Fort Smith Company, demanded the interstate Commission rate of fifteen cents per hundred pounds, having been previously instructed by the Texarkana & Fort Smith Company that ten cents per hundred pounds was its rate from Ruliff to Beaumont. This Powell Company, under instructions of the Sabine Tram Company, at first refused to pay, but after communicating with the Tram Company, finally paid the freight at this rate under protest, in order to get possession of the lumber.

"For switching from Sabine to the docks, the rules and orders of the Texas Railroad Commission would allow a switching charge of $1.50 per car on domestic shipments, and if foreign or interstate shipments, the Interstate Commerce Commission tariffs would allow a switching charge of $2.50 per car, had not the charge for this service been absorbed in the 15 cent rate established as aforesaid.

"Upon shipments of freight not 'for export, only 48 hours free time was allowed for unloading cars, after which demurrage was charged, and if not removed from railroad premises when unloaded, a storage charge was made in addition. No such charge was made upon any of the lumber involved in this suit.

"W. A. Powell Company, Limited, regarded the shipments in controversy as export shipments, and demanded, expected, and received, the use of terminal facilities, additional free time and other privileges accorded to shippers of export freight under export tariffs.

"The railway company knew, when the freight charges were collected, that the lumber was to be placed in its slips and exported to Europe on incoming ships and the freight was believed by the officers and agents of the railroad company at the time the charges were collected to constitute foreign commerce and to both permit and require the application of the rate fixed by the tariff on file

with the Interstate Commerce Commission, and this rate was applied.

"All the lumber in question was in fact unloaded from the cars by W. A. Powell Company, Limited, into the Texas & New Orleans Railroad Company's slips, or upon its docks, in reach of ships' tackle and loaded into the ships previously chartered for the purpose by W. A. Powell Company, Limited, which steamships carried same thence direct to Europe, where this lumber was applied upon contracts for sale in Europe made before the lumber began to leave Ruliff, and made in fact before the lumber was purchased from the Sabine Tram Company, and before it was sawed, and before the logs from which it was sawed left the State of Louisiana for the Sabine Tram Company's mill at Ruliff, in the State of Texas. One of the ships actually waited at the docks at Sabine for the arrival of part of this lumber which constituted a portion of its cargo.

"The ship which carried the last of this lumber from Sabine to Europe was chartered by W. A. Powell Company, Limited, for this purpose after these lumber shipments began to arrive at Sabine, but before all of the shipments had left Ruliff.

"None of this lumber remained in the slip at Sabine, or on the docks, except for the time necessary to await the arrival of the particular ship which had previously been chartered for the purpose and designated by W. A. Powell Company as the ship which was to carry that particular lumber from the port of Sabine to Europe.

"Any shipment of lumber intended for export to Europe, and in fact shipped from any point in Texas, to and through Sabine as its port of transshipment, could be contracted for, billed to and from Sabine, shipped, transported and handled in every particular just as was this lumber.

"W. A. Powell Company, Limited, before this lumber began to arrive at Sabine, took out a blanket policy of in-

surance, protecting same against loss, from the time this lumber should come into the possession of W. A. Powell Company, Limited, at Sabine until its final delivery by W. A. Powell Company, Limited, in European ports.

"At the time this lumber was shipped it was destined by Powell Company for export to some foreign port, but the particular destination of any particular portion of the lumber was not fixed, although the destination of all of the lumber to certain foreign ports was known and fixed. The Sabine Tram Company had no concern with the destination of the lumber after it came into the hands of Powell Company, and had no particular knowledge thereof. It supposed from the fact that it was known that Powell Company were exporters of lumber, from the character of lumber which was such as was intended for export, from the fact that Sabine was an important place at which very little lumber was used, and from other facts and circumstances, known to millmen generally, that the lumber was intended for export, but gave that matter no concern, being only concerned with the delivery of the lumber to Powell Company at Sabine station, and paying the freight thereon. What was done by the Texas & New Orleans Railroad Company after the arrival of the lumber at Sabine, in the way of switching to the docks, allowance of certain privileges allowed only to export freight, was done at the instance and for the benefit of Powell Company, with which the Tram Company had no concern.

*　　*　　*　　*　　*　　*　　*　　*

"Upon the freight bills was a charge for wharfage against the Tram Company which was paid by Powell Company as a proper charge against them and not against the Tram Company. Export freight was entitled to seven days' free time for unloading, and 30 days' free storage on the docks, or in the slips, which privileges were availed of by Powell Company in handling this lumber.

"The freight bills were made out against the Sabine Tram Company and defendants knew that Powell Company were paying the freight for the Tram Company.

"The defendants, in charging the export rate, acted under the advice of their attorneys, that the facts constituted the lumber an export shipment and subjected it to the Interstate Commerce Commission rate."

On motion the court modified its findings as follows:

"Powell & Company purchased lumber from other mills in Texas, with which to supply its said sales in part; it did not know when any particular car or stick of lumber left Ruliff, into which ship or to what particular destination it would ultimately go, or on which sale it would be applied; this not being found out until its agent, Flanagan, inspected the invoice mailed to, and received by, him after shipment. Upon inspection of the invoice, he determined from the character of the lumber described whether it was suited for one cargo or the other. The lumber remained, after arrival, in the slips or on the dock from one to thirty days until a ship chartered by Powell & Company arrived, when that company selected out the lumber suited for that cargo, and shipped it forward to the destination for which Powell & Company intended it.

"We withdraw our finding that the rules and orders of the Texas Railroad Commission would allow a switching charge of $1.50 per car on domestic shipments. The only testimony we can find on this point is that of witness Beard, General Freight Agent of the Texas & New Orleans Railroad Company, that 'the Texas rate for switching these cars would have been $1.50 per car, that is, if Powell Company owned the docks; if it was shipped to the warehouse owned by consignees or his place of business.' This testimony does not authorize the general finding on this point made by us.

"The freight rate due under the tariff on file with the Interstate Commerce Commission and collected on these

shipments was 15 cents per hundred pounds and under
this rate, the services rendered without other charge
included switching from Sabine station to the docks,
seven days' free time exclusive of Sundays within which to
unload the lumber from the car and thirty days' free stor-
age of the lumber upon the docks at the wharves or in the
slips belonging to the Texas & New Orleans Railroad Com-
pany. W. A. Powell & Company, Ltd., availed itself of
all these services and privileges which were stipulated
for by the Interstate Commerce Commission tariff and
included in the 15 cent rate charged on export freight.

"There is not now and was not at the time these ship-
ments moved, any local market for lumber at Sabine,
the population of which place does not exceed fifty in
number. Appellees have never done any local business
at that point. For the year 1905 there was exported
through the port of Sabine 14,667,670 feet of lumber; for
the year 1906, 39,554,000 feet. The shipments in con-
troversy, together with other shipments of lumber to
Sabine and Sabine Pass, constitute a large and con-
stantly recurring course of foreign commerce passing
out through the port of Sabine."

*Mr. Hiram Glass* and *Mr. H. M. Garwood*, with whom
*Mr. Maxwell Evarts* and *Mr. S. W. Moore* were on the
brief, for plaintiffs in error:

The shipments in question constituted foreign com-
merce to which the rates prescribed by the Railroad Com-
mission of Texas did not apply. *Armour Packing Co.* v.
*United States*, 209 U. S. 56; *Baer Bros. Mer. Co.* v. *Mo.
Pac. R. Co.*, 13 I. C. C. Rep. 329; *Coe* v. *Errol*, 116 U. S.
517; *Cosmopolitan Shipping Co.* v. *Hamburg Am. P. Co.*,
13 I. C. C. Rep. 266; *Cotton Rate Advances*, 23 I. C. C.
Rep. 404; *Cutting* v. *Navigation Co.*, 46 Fed. Rep. 641;
*Denver &c. R. Co.* v. *Int. Com. Comm.*, 195 Fed. Rep. 968;
*G., C. & S. F. Ry. Co.* v. *Fort Grain Co.*, 72 S. W. Rep. 419;

S. C., 73 S. W. Rep. 845; *G. W. T. & P. Ry. Co. v. Barry*, 45 S. W. Rep. 814; *General Oil Co. v. Crain*, 209 U. S. 211; *Houston Nav. Co. v. Ins. Co.*, 89 Texas, 1; *La. R. R. Comm. v. St. L. S. W. R. Co.*, 23 I. C. C. Rep. 31; *La. R. R. Comm. v. T. & P. Ry. Co.*, 144 Fed. Rep. 68; *S. C.*, 184 Fed. Rep. 989; *Ohio R. R. Comm. v. Worthington*, 225 U. S. 101; *S. C.*, 187 Fed. Rep. 965; *Re Transportation of Sugar*, 22 I. C. C. Rep. 558; *Shepard v. No. Pac. R. Co.*, 184 Fed. Rep. 765; *Southern Pac. Terminal Co. v. Int. Com. Comm.*, 219 U. S. 498; *State v. G., C. & S. F. R. Co.*, 44 S. W. Rep. 542; *State v. I. & G. N. R. Co.*, 71 S. W. Rep. 994; *State v. Sou. Kansas R. Co.*, 49 S. W. Rep. 252; *Swift & Co. v. United States*, 196 U. S. 375; *T. & N. O. R. Co. v. Sabine Tram Co.*, 121 S. W. Rep. 256; *T. & P. Ry. Co. v. La. R. R. Comm. of La.*, 183 Fed. Rep. 1005; *The Daniel Ball*, 10 Wall 557; *Wood-Hagenbarth Cattle Co. v. G. H. & S. A. Ry. Co.*, 146 S. W. Rep. 538.

*G., C. & S. F. Ry. Co. v. Texas*, 97 Texas, 274; *S. C.*, aff'd, 204 U. S. 403, distinguished.

*Mr. George C. Greer* for defendant in error:

The shipments were intrastate, and therefore the local state rate applied; and the plaintiffs in error became liable to pay the penalties and suffer the consequences that the Texas laws prescribed for charging a higher rate.

The shipments in question were not a part of foreign commerce for the following reasons:

The lumber shipped was by the only shipment contract, or arrangement provided, destined for Sabine, and no other point when it left Ruliff. Nor was this shipment arrangement changed while the lumber was in transit.

The lumber was not committed to a common carrier for its final and continuous voyage to a foreign point.

There was no known or fixed destination to a foreign point; or any destination beyond Sabine within contemplation of the shipment under discussion.

The parties to each of the shipping contracts in question not only did not contract for a continuous shipment to a foreign point, but on the contrary they did not even intend that, by and through the agency of that shipment, the freight should go beyond Sabine; nor did they then provide any means or arrangements for its movement beyond that point: that being left to an intervening third party by a subsequent act.

The lumber was delivered to Powell Company, as it was intended to be, at Sabine, and it took the intervention of a new and independent shipment arrangement, or contract, to move it beyond that point. *G., C. & S. F. Ry. Co.* v. *Texas*, 204 U. S. 403; *S. C.*, 97 Texas, 274; *Coe* v. *Erroll*, 116 U. S. 524; *Pa. R. R. Co.* v. *Knight*, 192 U. S. 27; *Diamond Match Co.* v. *Ontonagon*, 188 U. S. 94; *Wabash Ry. Co.* v. *Illinois*, 118 U. S. 572; *Houston Direct Nav. Co.* v. *Insurance Co.*, 89 Texas, 6; *The Daniel Ball*, 10 Wall. 565.

After stating the facts as above, MR. JUSTICE McKENNA delivered the opinion of the court.

If we may regard the essential character of the shipments we can have no hesitation in pronouncing them to have been in interstate commerce. This conclusion seems indeed to be determined by the last finding of fact. It is there declared that "the shipments in controversy, together with other shipments of lumber to Sabine and Sabine Pass, constitute a large and constantly recurring course of foreign commerce passing out through the port of Sabine."

If the shipments were foreign commerce it is hardly necessary to make explicit the principle that the national dominion over them was supreme; and, conversely, if the shipments were not of that character they were subject to the regulating power of the State.

The shipments having the character of foreign commerce when they passed "out through the port of Sabine," when did they acquire it? We have had occasion to express at what point of time a shipment of goods may be ascribed to interstate or foreign commerce and decided it to be when the goods have actually started for their destination in another State or to a foreign country, or delivered to a carrier for transportation. *Coe* v. *Errol*, 116 U. S. 517; *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission*, 219 U. S. 498, 527.

The Sabine Company, while not denying this general test, urges a more special one as applicable to the case at bar. The company contends that the supreme test is, "Was the lumber when it left Ruliff actually launched on its journey to a point in Europe; that is to say, was it committed, by the contract or by any arrangement, between the shipper and the railroad company, or provided for by either, to a common carrier for transportation on its continuous final journey to a destination beyond Sabine, Texas?" Answering this question in the negative, it is contended that the contract of shipment did not contemplate, provide for, or even intend that the freight should go beyond Sabine "through the agency of that shipment." Nor, it is further contended, were there any means or arrangements for its movement beyond that point, that being left to an intervening third party and a subsequent act after it was delivered to Powell Company, as it was intended to be, at Sabine; and "it took the intervention of a new and independent shipment, arrangement, or contract, to move it beyond that point." Fortifying the contentions, it is said that the existence of the conditions expressed is made the test of foreign commerce by the Interstate Commerce Law, its first section reading: "That the provisions of this Act shall apply . . . to the transportation . . . of property shipped from one place in the United States to a foreign country and carried

from such place to a point of transshipment, or shipped from a port of entry either in the United States or any adjacent foreign country." Freight is never shipped, in the sense of the law, it is further contended, until it is launched upon its final continuous trip to a foreign country. These contentions would seem to be tantamount to saying that a local bill of lading determined the character of the commerce, but counsel especially exclude this conclusion. They admit "that there may be some additional or outside arrangement for a continuous final movement to a destination beyond that named in the bill of lading, or the bill of lading may itself note a forward continuous movement beyond the destination named." It appears, therefore, that continuity of movement is the chief insistence and test of the Sabine Company, not necessarily, it is explained, in point of time or free of delays, but "an unbroken movement, proceeding under the original arrangement, or shipment."

The elements of the contentions are somewhat difficult to estimate. So far as they depend upon the character of a bill of lading and that it had not provision for carriage beyond the local destination, they are answered by *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498, and *Ohio Railroad Commission* v. *Worthington,* 225 U. S. 101. They are also answered by the following Texas cases: *State* v. *Southern Kan. Ry. Co.,* 49 S. W. Rep. 252; *State* v. *International & Gt. Nor. R. Co.,* 71 S. W. Rep. 994; *Gulf, C. & S. F. Ry. Co.* v. *Fort Grain Co.,* 72 S. W. Rep. 419; *Same* v. *Same,* 73 S. W. Rep. 845.

That there must be continuity of movement we may concede, and to a foreign destination intended at the time of the shipment. Indeed, all of the elements of the contentions of the Sabine Company are well illustrated by *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission* and *Ohio Railroad Commission* v. *Worthington, supra.*

In the former case we cited *Coe* v. *Errol* and decided that its principle was not defeated by the fact that the shipments were not made on through bills of lading. The case is instructive as well in its facts as in its principle. The product involved was cotton seed cake and cotton seed meal accumulated at the wharves of the Terminal Company at Galveston and the cake there manufactured into meal. The cake and meal were purchased in Texas and neighboring States, but chiefly in Texas, and shipped on bills of lading and way-bills to the purchaser and manufacturer, showing the point of destination to be Galveston. The purchases were made for export, there being no consumption of the products at Galveston. The sales to foreign countries were sometimes for immediate and sometimes for future delivery, irrespective of whether the product was on hand at Galveston. At times it was on hand. At other times orders had to be filled from cake purchased in the interior and then in transit, which, upon reaching Galveston, had to be ground into meal and sacked, and for the meal thus ground and sacked or thus bought ships' bills of lading were made. It was contended that the transit of the cake and meal absolutely ended at Galveston, that point being their final point of concentration and manufacture; the cake being there manufactured and sacked for export. The contention was rejected by the application of the principle which we have expressed. The points of resemblance between that case and the one at bar are obvious. Are the points of difference essential? In both cases the article was intended for export but had no definite foreign destination, nor had it been "committed to a common carrier for its final continuous voyage to a foreign point." In the *Terminal Case* the manufacturer and exporter of the products purchased them at interior points and had them shipped to himself at Galveston. In the present case the Sabine Company was the manufacturer and shipped them to the Powell Company,

the purchaser, who paid the freight charges for the Sabine Company. Upon the arrival of the lumber at Sabine it was carried without delay beyond and unloaded into the water in reach of ship's tackle. The continuity of the shipment was not as much broken as in the cited case. There, there was a delay for manufacturing; here, there was only such delay as was incident to transshipment from rail carriage to water carriage and to the nature of the traffic. It is said, however, that the Sabine Company had no connection with the lumber after its arrival at Sabine and had no concern with its destination after it came into the hands of Powell Company and had no particular knowledge thereof. Like circumstances undoubtedly existed in *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission.* It did not prevail there and cannot prevail here. The determining circumstance is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce, not its mere accidents, should determine. It was to supply the demand of foreign countries that the lumber was purchased, manufactured and shipped, and to give it a various character by the steps in its transportation would be extremely artificial. Once admit the principle and means will be afforded of evading the national control of foreign commerce from points in the interior of a State. There must be transshipment at the seaboard, and if that may be made the point of ultimate destination by the device of separate bills of lading the commerce will be given local character, though it be essentially foreign.

That it is the nature of the traffic and not its accidents which determines its character is illustrated by *Ohio Railroad Commission* v. *Worthington,* supra. A rate of 70 cents a ton was imposed by the Commission on what was called "Lake-cargo coal" from a coal field in eastern Ohio to the ports of Huron and Cleveland, Ohio, on Lake Erie,

for carriage thence by lake vessels. The shipper transported the coal ordinarily upon bills of lading to himself, or to another for himself, at Huron, and it appeared that the coal might be accumulated in large quantities at Huron and only taken out of the accumulated lots from time to time for the purpose of shipment out of the State. The rate of 70 cents, however, covered not only the transportation of the coal to Huron, but placing it on the vessels and trimming it for its interstate journey. It was held that its transportation to Huron was an interstate carriage.

Much stress was laid in the argument upon the fact that the coal was billed only to Huron. Replying to the contention the court said that the billing of the coal was not necessarily determinative, citing *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission, supra.*

*Gulf, Colorado & S. F. Ry. Co.* v. *Texas,* 204 U. S. 403, is urged as sustaining all of the contentions of the Sabine Company, and the case was considered so apposite and controlling that the Supreme Court of the State rested its decision entirely upon it. It demands, therefore, a careful review. Its facts were as follows: The Hardin Grain Company, doing business in Kansas City, Missouri, having made a contract with parties at Goldthwaite, Texas, for the delivery of two car loads of corn at that place, in order to comply with their undertaking, contracted to purchase of the Harroun Commission Company, who were also doing business at Kansas City, Missouri, and had an agent at Texarkana, Texas, the same quanity of corn, to be delivered at the latter point. The corn with which the Harroun Commission Company proposed to fulfill their contract was shipped from South Dakota to Texarkana, Texas, through Kansas City, Missouri. It was delivered at Texarkana, Texas, in accordance with the agreement, to the Hardin Grain Company, who thereupon shipped it in the same cars, without breaking bulk,

over the Texas & Pacific Railway and its connecting lines to Goldthwaite, Texas. Commenting on these facts the Supreme Court of the State, when the case was before it, said: "Since the contract of the Hardin Grain Company with the initial carrier at Texarkana was a contract for transportation wholly within this State, the question resolves itself into the inquiry whether the facts just stated changed the character of the transportation and made the carriage from Texarkana to Goldthwaite a part of an interstate shipment." The court decided that the carriage from Texarkana to Goldthwaite "should be deemed independent of and wholly disconnected from its transportation to Texas from South Dakota, or Kansas City." In other words, the court divided the commerce into two parts, one, the carriage from South Dakota and Kansas City to Texarkana, terminating by the delivery of the corn there to the Hardin Grain Company; and, one, which the court regarded as independent of and disconnected from the other, from Texarkana to Goldthwaite upon a bill of lading by which the railway company acknowledged the receipt from the Hardin Grain Company at Texarkana with orders to deliver to Saylor & Burnett at Galveston, Texas. This carriage, being wholly within the State, was pronounced to be a local shipment.

This court affirmed the judgment and decided that the contract between the Hardin Grain Company and the Harroun Commission Company was completed in accordance with its terms when the corn was delivered to the Hardin Company at Texarkana. "Then and not till then," it was said, "did the Hardin Company have full title to and control of the corn, and that was after the first contract of transportation had been completed." Then, and not till then, we may say, did the Hardin Company acquire the means of fulfilling its contract with Saylor & Burnett; and then, and not till then, did it start to fulfill its contract with Saylor & Burnett.

This was the determining circumstance both in the Supreme Court of Texas and in this court. It caused the Supreme Court of Texas to decide that the carriage of the corn from Texarkana to Goldthwaite should be deemed independent of and wholly disconnected from its transportation to Texas from South Dakota, or Kansas City. It caused this court, in effect, to adopt that ruling and to consider the corn not at any time to be that of Saylor & Burnett until it was started from Texarkana to Goldthwaite. It appeared that the corn remained five days in Texarkana, and, considering the bearing of this fact and the other facts, it was said: "The Hardin Company was under no obligation to ship it further. It could in any other way it saw fit have provided corn for delivery to Saylor & Burnett, and unloaded and used that car of corn in Texarkana. It must be remembered that the corn was not paid for by the Hardin Grain Company until its receipt in Texarkana. It was paid for on receipt and delivery to the Hardin Grain Company. Then, and not till then, did the Hardin Grain Company have full title to and control of the corn, and that was after the first contract of transportation had been completed."

It is manifest that these facts were the determining ones, and the history of the corn prior to its arrival at Texarkana was put aside as irrelevant and the controlling fact decided to be that corn belonging to the Hardin Grain Company was shipped from Texarkana to Goldthwaite, a strictly local shipment. This was the view taken of the case in *Ohio Railroad Commission* v. *Worthington, supra.* It was there urged to sustain the contention that the manner of billing was controlling of the character of the commerce. The contention was rejected, and, distinguishing the case and speaking of its facts, the court said (p. 109): "The facts showed that the corn was carried upon a bill of lading from Hudson [South Dakota] to Texarkana, and that afterwards, some five days later,

it was shipped from Texarkana to Goldthwaite, both points in the State of Texas. This was held to be an intrastate shipment unaffected by the fact that the shipper intended to reship the corn from Texarkana to Goldthwaite, for, as this court held, the corn had been carried to Texarkana upon a contract for interstate shipment, and · the reshipment five days later upon a new contract was an independent intrastate shipment." Distinguishing the case, it was said (p. 109): "It is evident from this statement of facts that the case is quite different from the one under consideration. There a new and independent contract for intrastate shipment was made, the interstate transportation having been completely performed. . . ."

The facts in the case at bar are different. The lumber was ordered, manufactured and shipped for export. And we say shipped, for we regard it of no consequence that the Sabine Company had no concern or connection with it after it reached Sabine. Its relation to the shipment was a perfectly natural one and did not change the relation of the Powell Company to it and make the lumber other than lumber purchased at Ruliff and started from there in transportation to a foreign destination. The findings are explicit and circumstantial as to this. And the shipment was not an isolated one but typical of many others, which constituted a commerce amounting in the year 1905 to 14,667,670 feet of lumber and in the year 1906, 39,554,000 feet. Nor was there a break, in the sense of the Interstate Commerce law and the cited cases, in the continuity of the transportation of the lumber to foreign countries by the delay and its transshipment at Sabine. *Swift & Co.* v. *United States,* 196 U. S. 375. Nor, as we have seen, did the absence of a definite foreign destination alter the character of the shipments.

*Judgment reversed and case remanded for further proceedings not inconsistent with this opinion.*