**HUMBLE OIL & REFINING CO.,**
Appellant,

v.

The **TEXAS & PACIFIC RY. CO.,** Appellee.

No. 14903.

Court of Civil Appeals of Texas.

Dallas.

Jan. 28, 1955.

Rehearing Denied March 4, 1955.

Andrews, Kurth, Campbell & Bradley, C. F. Morse, Harry R. Jones and Frank L. Heard, Jr., Houston, Leachman, Gardere, Akin & Porter and Neth L. Leachman, Dallas, for appellant.

Baker, Botts, Andrews & Shepherd and Denman Moody, Houston, Robertson, Jackson, Payne, Lancaster & Walker, John L. Lancaster, Jr., J. T. Suggs and W. R. McDowell, Dallas, for appellee.

DIXON, Chief Justice.

Appellant Humble Oil & Refining Company, plaintiff in the trial court, filed this suit against the Texas and Pacific Railway Company, defendant, for $410,335.29, alleged to be the amount of freight overcharges on 31,852 tank cars containing more than 7,000,000 barrels of sour crude oil. These tank cars of oil moved during the period, October 13, 1947 to May 31, 1948, over appellee's rail line from Midland, Texas, to Longview, Texas, and Camps, Texas.

Appellant's suit is based on its claim that the oil in question was entitled to move under intrastate instead of interstate freight rates.

Both sides filed motions for summary judgment and replies thereto, each movant asserting that there was no material dispute or conflict as to the facts, which had been fully developed. Attached to the motions for summary judgment were depositions, affidavits, exhibits, and answers to requests for admissions, which together with the pleadings made up a transcript of 413 pages. The trial court overruled appellant's motion for summary judgment but sustained that of appellee. Judgment was accordingly entered that appellant take nothing by reason of its suit, from which judgment this appeal was taken.

The material facts are undisputed. In the year 1947 appellant was faced with an unusually heavy demand for sour crude oil from Texas Gulf Coast refineries and also Esso Standard Oil Company. The last named company desired large quantities of oil for shipment by its own privately chartered vessels to our Eastern Seaboard. To meet this demand appellant collected large quantities of oil either produced by itself or bought from other companies, said oil coming from sources in New Mexico and West Texas. Pipe line facilities were inadequate to transport the oil so collected as expeditiously as desired, so appellant decided to ship some of the oil by tank cars over appellee's rail line from Midland, Texas, to Longview, Texas, and Camps, Texas. Pursuant to this plan the oil involved herein was transported by pipe line from its various sources to Midland, Texas, there loaded into tank cars, then hauled by appellee to Longview, Texas, and Camps, Texas, where it was once more placed in pipe lines in which it completed its journey to Texas Gulf Coast destinations.

In order to make oil available from these various sources, including the oil produced in New Mexico, appellant entered into what is known as a buy and sell contract with Atlantic Refining Company. By the terms of this agreement appellant obligated itself to sell and deliver to Atlantic Refining Company certain quantities of crude oil produced in New Mexico and West Texas; and Atlantic Refining Company obligated itself to sell and deliver to appellant equivalent quantities of crude oil, which were to be delivered into tank cars supplied by appellant at Atlantic Pipe Lines loading rack at Midland, Texas. The purpose—and apparently the only purpose—of this agreement was to protect both appellant and Atlantic Refining Company from price differentials arising from differences in specific gravity of oil produced in different fields. Oil produced in one field may have a different specific gravity, hence a different price, from oil produced in another field. It is impractical to keep these different oils segregated during shipment. They become commingled during transportation into a sort of common stock with a common specific gravity. To eliminate this differential in gravity and price, buy and sell agreements are made whereby crude is bought by one of the companies to the agreement from the other company to the agreement at certain locations

at certain gravity, then sold back at the new gravity it has developed upon delivery as part of the common stock after having been commingled with other oils in the course of transportation.

Near Midland, Texas, where the oil was loaded into appellee's tank cars, Atlantic Pipe Line Company maintains what is known as its McCook Tank Farm. This "Farm" consists of thirty-two huge tanks, each with a capacity of 80,000 barrels of oil, and five tanks each with a capacity of 55,000 barrels. Oil is received at the Mc-Cook Tank Farm from the west through three feeder pipe lines of Atlantic Pipe Line Company as follows:

(a) Atlantic's Wink line extending from Wink, Texas, to Midland, Texas, having a capacity of 40,000 barrels per day. This pipe line lies wholly within the State of Texas, and handled only oil produced in Texas.

(b) Atlantic's Crane line, extending from Crane, Texas, to Midland, Texas, having a capacity of 15,000 barrels per day. This pipe line also lies wholly within the State of Texas.

(c) Atlantic's Hobbs line, extending from Hobbs, New Mexico, to Midland, Texas, having a capacity of 20,000 barrels per day from New Mexico. This line had an intermediate station at Andrews, Texas, where Texas oil was injected and the overall capacity of the line increased to 28,000 barrels per day. Thus it will be seen that the Hobbs line handled both interstate and intrastate oil.

In addition to the above named lines, the McCook Tank Farm was also fed from the west by lines of Texas-New Mexico Pipe Line Company, Gulf Pipe Line Company, and Magnolia Pipe Line Company.

On the north side of the tank farm Atlantic Pipe Line Company had a tank car loading rack capable of loading 75 tank cars simultaneously. This loading rack was served by three feeder lines, one of them being the Hobbs line from New Mexico, which could be and was tied directly to the loading rack, the other two lines coming from the tank farm. Thus the oil coming from New Mexico, which was interstate oil, went directly into the loading rack, thence into the tank cars involved in this controversy. This interstate oil was mixed indiscriminately with intrastate oil in the loading rack, but the witnesses all agree that it is impossible to ascertain the proportions of interstate oil and intrastate oil in any one tank car. It is obvious that some interstate oil went into some of the tank cars, probably most of them. But there is no testimony either way that some interstate oil did or did not, find its way into all—that is each and every one—of the tank cars. However it is clear and undisputed that the interstate oil was not segregated from the intrastate oil, but the two were poured into the common loading rack simultaneously, whence they drained into the tank cars for the rail segment of their movement to the Texas Gulf Coast.

The movement of the oil by rail was covered by about 3,000 bills of lading, each bill of lading including approximately ten tank cars. All the bills of lading designated the shipments as moving from Midland, Texas, to Longview, Texas, and Camps, Texas. Some of the bills of lading contained a notation that the shipments were interstate; some of them that the shipments were intrastate; and some of them bore no notation either way. But on every bill of lading the freight rate listed was the interstate rate.

The information for preparing the bills of lading was furnished by appellant or its agents. Appellee, not knowing the production sources of the oil, relied on appellant to determine whether the oil being shipped was intrastate or interstate. It was appellant, or its agents, who prepared the bills including the notations placed on them as to the character of the shipments. It was appellant, or its agents, who decided that the interstate rate was applicable and computed the freight charges accordingly. All the freight bills so computed were paid without question by appellant. For a short interval of time the intrastate rate was inadvertently charged, but when appellant's attention was

called to the incident, it agreed that the interstate rate was properly applicable and paid appellee about $13,000, the amount of the undercharge.

The testimony indicates that appellant knew that some of the oil involved was produced in New Mexico, and some of it in West Texas; and, further, that from the beginning of the movements in question it was the purpose and intention of appellant that the oil should move from its sources of production to the Texas Gulf Coast in the manner that it did move.

The deposition of the manager of appellant's crude oil department was attached to appellant's motion for summary judgment. In his deposition this witness testified that when Humble sold some of the oil involved to Esso Standard Oil Company all transportation charges were included. It is apparent, therefore, that appellant has not sustained any financial loss on the transportation of said oil regardless of whether the correct rate was applied.

The witness also testified that he understood that that part of the oil which was produced in New Mexico was brought across the state line into Texas by common carrier pipe line. He further testified that that part of the oil which moved from Camps, Texas, to Atreco, Texas (on the Gulf Coast), moved on an interstate pipe line rate. It was his testimony also that to the best of his knowledge every tank car shipped over appellee's line could have contained a mixture of interstate and intrastate oil—it was conceivable. But it could have been straight grade. He didn't know, himself, nor did he know of anyone who does know.

Appellant freely admits that it was mistaken as to the applicable freight tariff at the time the shipments moved, at which time it pronounced the shipments to be interstate transportation and itself filled out the bills of lading, inserting the interstate rate therein. But it asserts that as a matter of law this mistake is not binding on it now.

■ We agree that if appellant, as asserted in its point five, did make a mistake about the applicable freight tariff, such mistake would not constitute legal grounds for deciding this case against appellant. Under both the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. and the Texas Railroad Commission Act, Vernon's Ann.Civ.St. art. 6444 et seq., it is mandatory upon carriers and shippers to receive and pay freight charges assessed under the applicable rate. The primary purpose of both acts is to prevent discrimination. It is therefore made the high duty as a matter of law for the carrier to collect and the shipper to pay the correct transportation charges. And neither party, in an overcharge or undercharge suit, may excuse its failure to apply the proper tariff on grounds of agreement, waiver, estoppel, or mistake. Kansas City S. R. Co. v. C. H. Albers Commission Co., 223 U.S. 573, 32 S.Ct. 316, 56 L.Ed. 556; Texarkana & Ft. S. Ry. Co. v. Houston Gas & Fuel Co., Tex.Com.App., 121 Tex. 594, 51 S.W.2d 284; Southern Pacific Co. v. Southern Rice Sales Co., 142 Tex. 264, 178 S.W.2d 264. Consequently the court's consideration of what appellant and its agents said and did in the past about these oil shipments must be limited to facts as distinguished from conclusions.

The first three points relied upon by appellant revolve around the contention that each of the bills of lading shows an origin in Texas and a destination in Texas, and the undisputed evidence shows that the transportation service performed by appellee began within, took place within, and went to a destination within the State of Texas, hence each shipment was presumably intrastate in character; and appellee failed to overcome such presumption by legal and competent evidence.

■ We do not believe that the facts in this case set up any such presumption as that asserted by appellant. Some of the bills of lading contain recitations that the shipments are interstate in character. All of them on their face show the interstate rate. Such documents in themselves, far from establishing the presumption claimed by appellant, are sufficient, we think, to put interested persons on inquiry as to whether

the freight movements were interstate or intrastate in character.

■■ But more than that, we think the true rule which must guide us in this case is that relied upon by appellant itself to support its fifth point: It is the essential character of the commerce itself as shown by the facts surrounding the movement which determines whether it is interstate or intrastate. In applying this rule it has often been held that neither the form of the bill of lading showing an intrastate shipment nor the fact that one particular carrier performed its service wholly within a state, is determinative, if such transportation within a state was but a segment of an interstate movement. Railroad Commission of Louisiana v. Texas & Pacific R. Co., 229 U.S. 336, at page 341, 33 S.Ct. 837, 57 L.Ed. 1215; United States v. Erie Railroad Co., 280 U.S. 98, at page 101, 50 S.Ct. 51, 74 L.Ed. 187; Texas & N. O. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442; Illinois Central R. Co. v. De Fuentes (Louisiana Railroad Commission) 236 U.S. 157, 35 S.Ct. 275, 59 L.Ed. 517; State v. International & G. N. R., 31 Tex.Civ.App. 219, 71 S.W. 994, at page 996. In the case now before us it is undisputed that some of the oil involved moved directly by pipe line from New Mexico across the state line into Texas and on to Midland, Texas, where it was transferred for a continuation of its journey into appellee's tank cars, to be hauled to Longview, and Camps, Texas, at which points it was poured back into pipe lines, in which it resumed its movement, as originally intended, to the Texas Gulf Coast.

We overrule appellant's first three points on appeal.

Appellant's point four asserts that the McCook Tank Farm at Midland, Texas, was an assembly, or distribution point of Atlantic Refining Company, and that each of the tank car shipments from that point accordingly was a purely local movement in intrastate commerce. We are referred to Southern Pacific Co. v. Van Hoosear, 9 Cir., 72 F.2d 903, for a description of such an assembly or distribution point as appellant has in mind.

■ Under the facts of this case we do not believe that appellant's assembly or distribution point theory is tenable. It is to be remembered that part of the oil involved herein never went into the storage tanks at the McCook Tank Farm. The Hobbs pipe line, bringing oil from New Mexico, was connected directly with the loading rack north of the Farm, so its flow of interstate oil poured into the tank cars for a continuation of its journey to the Texas Gulf Coast without any stop-over or storage at the Tank Farm. This interstate oil was mixed and commingled with other oils in proportions which it is impossible to determine. It is true that when there were no tank cars to be loaded from the rack the Hobbs pipe line was connected with the storage tanks. But even then, according to Mr. Paden, Assistant Manager of Atlantic Pipe Line Company, there was no processing or refining of the oil at the Tank Farm, and there was no permanent storage there. Mr. Paden got the oil in and out as fast as he could.

■ It has been held that the fact that property moving in interstate commerce has been temporarily stored, or even that title has passed, does not necessarily make it intrastate commerce when the intention existing at the time the movement started was that it was to make an interstate movement. Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839; Pennsylvania R. R. Co. v. Clark Bros. Coal Min. Co., 238 U.S. 456, 35 S.Ct. 896, 59 L.Ed. 1406; Carson Petroleum Co. v. Vial, 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626; State of Texas v. Anderson, Clayton & Co., 5 Cir., 92 F.2d 104, certiorari denied 302 U.S. 747, 58 S.Ct. 265, 82 L.Ed. 578; Clark v. Atlantic Pipe Line Co., Tex.Civ.App., 134 S.W.2d 322 (writ ref.). We do not say that under a different fact situation the McCook Tank Farm might not become an assembly or distribution point as asserted in appellant's point four. We do say that under the undisputed facts of this case it is not to be

so regarded. We overrule appellant's point four.

Appellant admits that as plaintiff in the trial court it had the burden of proof. As we have already said, the facts of this case do not raise any presumption in favor of appellant as to the character of the shipments. Therefore in order for appellant to show that the intrastate rate was applicable, it had to establish the character of the commerce involved in the movement of each of the 31,852 tank cars of oil. It is certain under the evidence that some of the tank cars contained interstate oil. It seems probable that most if not all of the cars contained a mixture of oils, some of which was moving in interstate, some in intrastate commerce. Possibly a few of the tank cars contained only intrastate oil. Appellant itself concedes that it is impossible to say which, if any, of the tank cars contained only intrastate oil. The two oils—interstate and intrastate—had not been segregated before or after being poured into appellee's tank cars. Thus appellant was faced with a burden of proof which it could not possibly carry.

We think that since the interstate and intrastate oils were mixed and commingled in their transportation to the extent that their segregation was impossible and even their proportionate amounts in the tank cars could not be determined, the interstate rate must apply. The Supreme Court of the United States has said, "Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the state, that is entitled to prescribe the final and dominant rule * * *." Houston, E. & W. T. R. v. United States, 234 U.S. 342, 34 S.Ct. 833, 836, 58 L.Ed. 1341. We also quote from the opinion in Clark v. Atlantic Pipe Line Co., Tex.Civ.App., Austin, 134 S.W.2d 322, at page 327, writ ref.: "Nor was the interstate character of the shipments affected by the commingling with other oil of the same grade and delivery of the quantity and grade and not the identical oil consigned. Vial case above; Railroad Commission [of Ohio] v. Worthington, 225 U.S. 101, 32 S.Ct.

653, 56 L.Ed. 1004; Texas & N. O. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442." See also Carson Petroleum Co. v. Vial, 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626, and Wisconsin-Michigan Power Co. v. Federal Power Commission, 7 Cir., 197 F.2d 472.

Our holdings on the points discussed in effect dispose of all the points on appeal raised by appellant. All of said points are overruled.

The judgment of the trial court is affirmed.