## BECHER-BARRETT-LOCKERBY COMPANY v. NORTHERN PACIFIC RAILWAY COMPANY AND ANOTHER.[1]

January 25, 1924.

No. 23,644.

**Intention of consignor.**

1. In determining whether a shipment is intrastate or interstate the intention of the shipper is important.

**Character of shipment fixed by final election of shipper as to transit.**

2. When the bill of lading contains transit tariff provisions giving the shipper the right to make further movements treating the whole as a continuous shipment, its character as to being intrastate or interstate, is not determined until it is determined whether the shipment will be disposed of locally or the transit tariff used in further movement—and in such case the final election of the shipper reflects upon the character of the shipment in its inception.

**Essential character governs.**

3. The question as to whether a shipment is intrastate or interstate must be determined by the essential character of the shipment.

**Reshipment of interstate shipment.**

4. The fact that an interstate shipment is reshipped by the consignee in the car in which it is received, to other points of destination, does not necessarily establish a continuity of movement or prevent the reshipment to a point within the state from having an independent and intrastate character.

**First movement not necessarily of same character as last.**

5. Likewise, if the last movement is interstate, it does not necessarily follow that the first movement was also interstate.

[1]Reported in 197 N. W. 103.

**Beginning of interstate shipment.**

6. An interstate shipment does not begin until the shipment has been shipped or started for transportation from one state to another.

**Carrier cannot deprive shipper of interstate rate.**

7. A carrier cannot, by separating the rate into its component parts, charging local rates and issuing local waybills, convert an interstate shipment into intrastate transportation and thereby deprive a shipper of an interstate rate.

**Subterfuge of shipper to get cheaper rates.**

8. Where a shipment is intended for another state, but the shipper in form makes a complete contract for shipment to a point different than the real destination, for the purpose of getting a cheaper rate, and then later rebills to the ultimate destination, carrying out the original plan, the transaction is interstate.

**Unessential elements of interstate shipment.**

9. Neither through billing, uninterrupted movement, continuous possession by carrier, nor unbroken bulk is an essential element of an interstate shipment. These are important, but where its ultimate destination is admitted these incidents are without legal significance as bearing upon the character of the shipment.

**Improper conduct on part of shipper.**

10. It was formerly assumed that a shipper might ship and reship repeatedly to gain a better rate; but it is now recognized that such conduct is not just and is no longer permissible.

**Reshipment by consignee.**

11. The fact that a car is received on interstate movement, is reshipped by the consignee, after a brief interval, to another point, does not, of course, establish an essential continuity of movement to the latter point. The reshipment may be an independent intrastate movement; and, conversely.

**Sale at Duluth of car of Minnesota grain delivered at Superior.**

12. Plaintiff shipped a car of grain from Holloway, Minnesota, on an interchange bill of lading to Willmar, Minnesota, and thence to Hinckley, Minnesota, over the Great Northern line and thence to Duluth, Minnesota, over the Northern Pacific line, consigned to itself at Duluth

and the bill of lading was stamped on its face "route entirely within Minnesota." While car was in transit plaintiff sold a car of grain on the floor of the Duluth board of trade to a purchaser who operated elevators both in Duluth, Minnesota, and Superior, Wisconsin. Under the rules of the board of trade, the seller was required to deliver grain in Duluth or Superior as the purchaser elected. Car arrived in Duluth September 8. It was tendered to purchaser who accepted it and requested plaintiff to make delivery at Superior, Wisconsin. Plaintiff gave orders to the railroad company to move the shipment to Superior, Wisconsin, which it did on September 12. Shipment made in good faith and shipper did not know car was to go to another state until after it reached Duluth. Held: (1) That the shipment from Holloway to Duluth was intrastate; (2) that the shipment from Duluth, Minnesota, to Superior, Wisconsin, was interstate; (3) that both of the shipments were separate and independent contracts; one intrastate, and the other interstate; (4) that the character of such shipment on the original shipment cannot be determined by the decision of the purchaser in Duluth.

**Form of contract.**

13. The form of the contract is immaterial.

**Interstate shipment if made for purpose of defeating rate.**

14. Had the method of handling this shipment been adopted to defeat interstate rate, and its ultimate destination been known, when shipment started, it would be held interstate from inception.

**Proof of character of shipment.**

15. The definite character of such shipment is fixed when the movement of the commodity has commenced for the purpose of transportation. Such character is usually to be determined from the intention of the shipper and the carrier as indicated by the bill of lading, the continuity of the movement of the shipment, its delivery under the contract of shipment, and other facts present of sufficient probative force to determine the inquiry.

Action in the municipal court of Minneapolis, against defendant railway companies to recover $71.55. The case was tried before Charles L. Smith, J., who made findings and ordered judgment in favor of defendants. From an order denying its motion for amended

findings and conclusions or for a new trial, plaintiff appealed. Reversed and judgment directed for plaintiff.

*Devaney & Edwards* and *W. W. Patterson*, for appellant.

*D. F. Lyons* and *D. R. Frost*, for respondents.

WILSON, C. J.

About August 30, 1920, the plaintiff caused a carload of oats to be delivered to the Great Northern Railway Company, at Holloway, Minnesota, for shipment and transportation to Willmar, Minnesota; and thereafter the plaintiff directed this railway company to issue an exchange bill of lading for said oats providing for the transportation of the same to Duluth over its line from Willmar to Hinckley, and from there over the line of the Northern Pacific Railway Company to Duluth.

About September 1, 1920, while said car was in transit, the defendant Great Northern Railway Company issued the exchange bill of lading providing for the transportation of said car of oats as requested by the plaintiff and, in said exchange bill of lading, the plaintiff was the consignee of said shipment, with Duluth named as the destination; said exchange bill of lading was indorsed: "Route entirely within Minnesota," and said car of oats was thereafter hauled by the said Great Northern Railway Company to Hinckley, Minnesota, and there delivered to the defendant Northern Pacific Railway Company and by it hauled from Hinckley to Duluth.

Plaintiff has its principal office at Minneapolis, Minnesota, and maintains a branch office at Duluth, Minnesota; and while said car was in transit to Duluth, on September 1, 1920, plaintiff's representative in Duluth sold, to arrive, one car of No. 3 white oats to the Globe Elevator Company which operates elevators in both Duluth, Minnesota, and Superior, Wisconsin. Said sale was made on the floor of the board of trade at Duluth, and, under its rules by the terms of the sale, the purchaser had the privilege of requiring delivery at any elevator, for unloading, within the limits of Duluth, Minnesota, or Superior, Wisconsin. It was not the particular carload of oats in question that was the subject of the particular sale, but the sale was of a carload of oats of a specified grade, and the

plaintiff had the right, upon the arrival in Duluth and inspection of said car, to use that particular car for other purposes if it saw fit or to use it to fulfil the contract of this particular sale, if it so elected; although, while this car was in transit, plaintiff concluded to have it apply on this sale, if it passed inspection. This shipment arrived in Duluth on September 8.

The railroad company promptly notified the plaintiff of the arrival of the car and a sample was taken by state officials and submitted to the purchaser, who then advised the plaintiff it desired the oats delivered at its elevator No. 1 at Superior, Wisconsin, and requested the plaintiff to have said car forwarded to Superior, Wisconsin, and placed on track at that elevator; and thereupon the plaintiff gave to the defendant Northern Pacific Railway Company an order to move said car to such destination, which it did on September 12 and upon completion thereof demanded from the plaintiff compensation as freight on such transportation in the sum of $243.87, which plaintiff, under protest, paid. This amount of freight was in accordance with the tariff for an interstate shipment from Holloway, Minnesota, to Superior, Wisconsin. The local freight from Duluth to Superior was 4½ cents per 100 lbs. and in addition thereto there was a switching charge of $2 and, paying this rate from Duluth to Superior and then including the local intrastate rate for this shipment from Holloway to Duluth, we have a total of $172.32, giving a difference of $71.55, for which amount this action is brought to recover. The defendants resisted the action on the theory that this shipment, from its inception to its final destination, was in fact an interstate shipment and, therefore, it exacted the amount of freight which it received. The trial court sustained the contention of the defendants and the plaintiff has appealed from an order denying its alternative motion for amended findings of fact and conclusions of law or for a new trial.

In arriving at a conclusion as to the matters in controversy we must look to the Federal decisions for guidance.

In Gulf, C. & S. F. Ry. Co. v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. ed. 540, the facts were these: A grain dealer at Kansas City, Missouri, sold to Saylor & Burnett at Goldwaite, Texas, two

cars of corn to be delivered on track at Goldwaite. The dealer did not then own such corn but thereafter, to fill this contract, bought from Harroun Commission Company the necessary corn, to be delivered to the dealer at Texarkana, Texas. Previous to this the Harroun firm had contracted for the purchase of two carloads of corn to be delivered at Texarkana, Texas, and with these two cars it expected to and did fill its order of the dealer. These cars had originated in Hudson, South Dakota. The dealer bought corn for delivery at Texarkana, instead of Kansas City, because it could save in freight 1½ cents per bushel on the haul to Goldwaite. It intended to ship the corn on to its ultimate destination just as soon as practicable. The dealer furnished blank bills of lading made out by it for a local shipment from Texarkana to Goldwaite. Neither of the parties had any warehouse at the intermediate point. Harroun Commission Company did not know what disposition was to be made of the corn until the last transaction was had. The corn remained in Texarkana for a period of 6 days. Upon these facts the court held that the character of a shipment, whether local or interstate, is not changed by a transfer of title during transportation. That whether it be one or the other may depend upon the contract of shipment. That the first contract here was from Hudson to Texarkana. That while corn was sold in transit it was interstate after the sale as well as before. When the corn was accepted at Texarkana the transportation contracted for ended. The carrier was under no obligation to carry it further. It delivered it to a connecting carrier who in turn was to carry and deliver under its contract with the then owner. In substance the court held that there was a new and independent contract for the intrastate shipment, and that the interstate transportation had been previously completely performed.

In So. Pac. Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 Sup. Ct. 279, 55 L. ed. 310, it is held that goods actually destined for export are necessarily in interstate commerce when they actually start in course of transportation to another state or are delivered to a carrier for transportation; and that this is the same whether the goods are shipped on through bills of lading or on an initial bill only to the terminal within the state where they are to

be delivered to a carrier for the foreign destination. It is to be noted that this decision rests upon the fact that such shipment, at its inception, was concededly started for a foreign destination. To the same effect in substance is the holding of Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. 475, 29 L. ed. 715. Conversely it should follow that a shipment is not necessarily an interstate shipment instead of an intrastate shipment merely because it was not rebilled.

Ordinarily a shipment then may be ascribed to interstate commerce when the goods have actually started for their destination in another state. Texas & N. O. R. Co. v. Sabine Tram Co. 227 U. S. 111, 123, 33 Sup. Ct. 229, 57 L. ed. 442. There must be a continuity of movement, and a foreign destination intended at the time of the shipment. Id.

In Southern Pac. Terminal Co. v. Interstate Commerce Com. supra, cotton seed cake and meal were bought by the purchaser in several states including Texas, and shipped to him on bills of lading and way bills showing the point of origin in these states and the destination at Galveston. The purchases were made for export, there being no consumption of the products at Galveston. The purchaser's sales to foreign countries were sometimes for immediate and sometimes for future delivery, irrespective of whether he had the product on hand at Galveston. At times he had it on hand. At times, therefore, orders had to be filled from cake to be purchased in the interior or then in transit. When the cake reached Galveston, it was ground into meal and sacked by the owner, and, for the meal thus ground and such meal as had been brought to his customers, he took out ship's bills of lading made to his order. Here a manufacturing plant was on the wharves which were intended for shipping facilities. It was there urged that as to purchases, arising in the state, the first shipment ended at Galveston and the court said [219 U. S. 526]:

"It is manifest as we have said, that to make the wharves manufacturing or concentrating points for one shipper and not for all is to give that shipper a preference. And, being a preference, the traffic necessarily comes under the jurisdiction of the Interstate

Commerce Commission. In other words, the manufacture or concentration on the wharves of the Terminal Company are but incidents, under the circumstances presented by the record, in the transshipment of the products in export trade and their regulation is within the power of the Interstate Commerce Commission. To hold otherwise would be to disregard, as the Commission said, the substance of things and make evasions of the act of Congress quite easy. It makes no difference, therefore, that the shipments of the products were not made on through bills of lading or whether their initial point was Galveston or some other place in Texas. They were all destined for export and by their delivery to the Galveston, Harrisburg and San Antonio Railway they must be considered as having been delivered to a carrier for transportation to their foreign destination, the Terminal Company being a part of the railway for such purpose."

The question as to whether shipments of lumber on local bills of lading from one point in Texas, destined for export, were intrastate or interstate commerce, arose in Texas & N. O. R. Co. v. Sabine Tram Co. 227 U. S. 111, 33 Sup. Ct. 229, 57 L. ed. 442. The tram company was engaged in the manufacture of lumber at its mill at Ruliff. Powell & Company was engaged in buying lumber for export to different points in Europe, through certain ports in the state of Texas. August 28, 1906, having made sales to customers for future delivery in Europe of large amounts of heavy pine lumber, for the carriage of which steamships had in part already been chartered, to fill such contracts, Powell & Company bought of the tram company 500,000 feet of pine lumber of certain dimensions, to be delivered either in water at Orange, Texas, or f. o. b. cars at Sabine, Texas, at the option of the seller, and the seller exercised the option to deliver at Sabine. This lumber, so purchased, was delivered to the Texarkana & Fort Smith Railroad at Ruliff to be transported by it to Beaumont, the terminus of its line, and thence by connecting carrier, the Texas & New Orleans Railway, to Sabine and delivered to the tram company. There were 24 several shipments embracing 33 cars, for which 30 separate bills of lading were executed with clause:

"Notify Powell Company." Way-bills accompanied shipments upon which were marked in pencil "for export," but the tram company had no knowledge or connection with the making of these way-bills which was the act of the railway company alone. The bills of lading were indorsed by the tram company and were attached to drafts and sent through a bank to Powell & Company. Upon arrival at Sabine and at the direction of the Powell Company the shipment was carried about a quarter of a mile beyond the station to the dock where the lumber was to be unloaded. It was unloaded from the cars into the water of the ship in reach of the ship's tackle, ready for loading onto ships. The transportation from Ruliff to Sabine was entirely within the state of Texas. The controversy was as to the rate of freight as in the instant case.

Powell & Company regarded the shipments in controversy as export shipments, and demanded, expected and received the usual terminal facilities, additional free time and other privileges accorded to shippers of export freight under export tariffs. The railroad company knew that the lumber was to be exported. The tram company gave no concern to the destination of these shipments, and had no particular knowledge thereof. It supposed they were for export. "The determining circumstance is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce, not its mere accidents, should determine. It was to supply the demand of foreign countries that the lumber was purchased, manufactured and shipped, and to give it a various character by the steps in its transportation would be extremely artificial. Once admit the principle and means will be afforded of evading the national control of foreign commerce from points in the interior of a state. There must be transshipment at the seaboard, and if that may be made the point of ultimate destination by the device of separate bills of lading the commerce will be given local character, though it be essentially foreign." [227 U. S. 126.]

The intention of the original shipper as to the final destination of the shipment is important. Railroad Commission of Ohio v. Worthington, 225 U. S. 101, 32 Sup. Ct. 653, 56 L. ed. 1004.

In Memphis Merchants Exchange v. Illinois Cent. R. Co. 43 I. C. C. Rep. 378, on page 388, this language is used:

"The question as to whether a shipment is inter or intrastate 'must be determined by the essential character of the commerce,' which is governed by the intent of the parties controlling the movement of the traffic; and this must be ascertained from all of the pertinent facts, circumstances, and conditions, and 'not by mere billing or forms of contract.' C., M. & S. P. Ry. Co. v. Iowa, 233 U. S. 334. It must be apparent, however, that in the case of traffic moving under transit tariffs providing for proportional or reshipping rates and other facilities or arrangements, dependent in their applicability upon a prior or subsequent movement to or from the transit point, the intent of the parties must be measured not merely by the intent of one of the parties at the time and place of shipment, but we must look to the fully ripened and completed intent as expressed and executed by the party controlling the movement of the traffic, whether it be the original consignor or consignee or the owner, who may be neither the original consignor nor consignee. The true and controlling intent which determines the essential character of the commerce is not fully matured and fixed until the party who, having the right so to do, decides, under the options lawfully available to him under the transit tariffs, what is to be the final destination of the shipment.

"In other words, the intent which is conclusive in determining the character of the completed transportation is not fully expressed or indicated until it is decided whether the shipment will be disposed of locally or the transit tariff provisions availed of for a further movement, treating the whole as a continuous shipment at the lawful through charge, however made up; that is, whether at available combinations or joint through rates. Neither the billing of the traffic originally to Cairo nor the registry there for transit is conclusive of the intent which finally determines whether it is a state

or interstate shipment. That completed and conclusive intent is not expressed, and may not exist, until it is finally determined under the transit tariffs, by whoever controls the movement at the time, whether or not it is to go beyond the limits of the initial state movement."

This language seems to more nearly support the contention of respondent in this case than any others we have found. However, this seems to be based upon the transit tariff that apparently affords certain options which are given to the shipper; and the final election on the part of the shipper would reflect upon the character of the shipment at its inception, and, by reason of such provision in the transit tariff, this decision was necessary by virtue of the terms of the contract in order to characterize or classify the movement as intrastate or interstate. This element which was controlling in that case is absent from the case now under consideration.

The question as to whether commerce is inter or intrastate must be determined by the essential character of the commerce. But the fact that commodities received on interstate shipments are reshipped by the consignees in the cars in which they are received, to other points of destination, does not necessarily establish a continuity of movement or prevent the reshipment to a point within the state from having an independent and intrastate character. The question is with respect to the nature of the actual movement in the particular case. Chicago, M. & St. P. Ry. Co. v. Iowa, 233 U. S. 334, 343, 34 Sup. Ct. 592, 58 L. ed. 988. For the same reasons it should follow that if the last movement is interstate it should not necessarily follow that the first movement was also interstate. An interstate shipment does not begin until the shipment has been shipped or started for transportation from one state to the other. Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination in another state is not fixed and certain. It may be sold or otherwise disposed of within the state, and never put in course of transportation out of the state. McCluskey v. Marysville & N. Ry. Co. 243 U. S. 36, 37 Sup. Ct. 274, 61 L ed. 578.

Where an interstate shipment has been made—and after 17 days have gone by since the interstate movement—and then while the cars are being switched and moved to a trestle for unloading, the last movement is intrastate and not interstate. Lehigh Valley R. Co. v. Barlow, 244 U. S. 183, 37 Sup. Ct. 515, 61 L. ed. 1070. The carrier cannot by separating the rate into its component parts, charging local rates and issuing local way bills, convert an interstate shipment into an intrastate transportation, and thereby deprive a shipper of the benefit of an appropriate rate for a through interstate movement. Baer Brothers Mercantile Co. v. Denver & R. G. R. Co. 233 U. S. 479, 34 Sup. Ct. 641, 58 L. ed. 1055.

Where a shipment is intended for a point in another state, but the shipper in form makes a complete contract for shipment to a point different than the real destination (for the purpose of getting a cheaper rate), and then after several days rebills it to the known ultimate destination, carrying out the original intention, the transaction is to be regarded in its entirety as an interstate shipment. Balimore & O. S. W. R. Co. v. Settle, 260 U. S. 166, 43 Sup. Ct. 28, 67 L. ed. 189. Under such circumstances, the intention as it was in fact carried out, determined as a matter of law, the essential nature of the movement. Neither through billing, uninterrupted movement, continuous possession by the carrier, nor unbroken bulk, is an essential of a through interstate shipment. These are common incidents of a through shipment; and, when the intention with which a shipment was made is in issue, the presence or absence of one or all of these incidents may be relevant and important. But where it is admitted that the shipment was at all times intended for its ultimate destination, these incidents are without legal significance as bearing upon the character of the shipment. B. & O. S. W. R. Co. v. Settle, supra.

It was formerly assumed that the shipper might so use a combination of local rates by consigning a car to himself at intermediate points, there pay the charges, take possession, and then reship to the next point, etc., until he reached his foreign destination, as to gain for himself a better rate. Morgan v. Missouri, K. & T. Ry. Co. 12 I. C. C. 525, 528; Big Canon Ranch Co. v. Galveston, H. & S. A.

Ry. Co. 20 I. C. C. 523, 526; D. E. Wood Butter Co. v. C. C. C. & St. L. Ry. Co. 16 I. C. C. 374. It is now recognized that such conduct is not just, and that it gives a way for depleting the revenues of a carrier from interstate rates which would be as much of a violation of the Act to Regulate Commerce as to permit a means of discrimination. Hence, such is no longer permissible. Kanotex Refining Co. v. Atchison T. & S. F. Ry. Co. 34 I. C. C. 271; Id. 46 I. C. C. 495; Lumber from Easton, Wash. 39 I. C. C 188, 189; Baltimore & O. S. W. R. Co. v. Settle, 260 U. S. 173, 43 Sup. Ct. 28, 67 L. ed. 189.

The mere fact that a car is received on interstate movement, is reshipped by the consignee, after a brief interval, to another point, does not, of course, establish an essential continuity of movement to the latter point. The reshipment, although immediate, may be an independent intrastate movement. Conversely, these privileges should apply to the case at bar.

In Bracht v. San Antonio & A. P. Ry. Co. 254 U. S. 489, 41 Sup. Ct. 150, 65 L. ed. 366, the shipper delivered a carload of vegetables to the railroad company at Ingleside, Texas, consigned to himself at Dallas, Texas, a point off its line, where he intended to sell them. He accepted a bill of lading upon the face of which was plainly written: "For use only between points within the State of Texas." The car moved over the line of the receiving company to Waco, and then over the Missouri, Kansas & Texas Railway to Dallas. Upon the shipper's request made after such arrival, the Missouri, Kansas & Topeka Railway Company forwarded the car to Kansas City over its own lines, took up the original bill of lading and issued an interstate one acknowledging the receipt of the vegetables at Dallas. When the vegetables reached Dallas they were in good condition, but when they reached Kansas City they were in bad condition; and, thereupon, the shipper sued the initial carrier, claiming a right to recover damages under the Carmack Amendment to the Interstate Commerce Act (34 St. 584, c. 3591), and the court said [254 U. S. 490]:

"Respondent's contract appears to have related only to a movement between points in the same State. It had no notice or reason

to suppose that the freight would pass beyond the destination specified. The original undertaking was an intrastate transaction, subject, of course, to any applicable rules and regulations prescribed by state authority. The record discloses none; and we are unable to say as matter of federal law that the tariff schedules for interstate shipments or the provisions of the Interstate Commerce Act constituted part of the agreement. The general principles announced in Gulf, Colorado & Santa Fe Ry. Co. v. Texas, 204 U. S. 403, 411, are applicable. Ohio Railroad Commission v. Worthington, 225 U. S. 101; Texas & New Orleans R. R. Co. v. Sabine Tram Co. 227 U. S. 111, and similar cases are not controlling. They involved controversies concerning carriage between points in the same State which was really but part of an interstate or foreign movement reasonably to be anticipated by the contracting parties—a recognized step towards a destination outside the State. The distinctions are elucidated in Texas & New Orleans R. R. Co. v. Sabine Tram Co. Here neither shipper nor respondent had in contemplation any movement beyond the point specified and the contract between them must be determined from the original bill of lading and the local laws and regulations."

The language of the court in the Bracht case is quite applicable here. We have in this case the railroad company indorsing its bill of lading: "Route entirely within Minnesota," showing clearly its understanding of its contract with the shipper. Its contract as evidenced by its bill of lading shows that it did not contract to carry this shipment beyond Duluth. It is also plain, and conclusively shown, that plaintiff did not, at the time it made the original contract of shipment, intend or expect this car to go beyond Duluth. Obviously, plaintiff bought this car to resell on the market to a then unknown purchaser. It sold a car of oats in Duluth and used this car to fill that sale. As a part of that sale, the plaintiff obligated itself, by virtue of the rules of the Duluth board of trade, to deliver the car to its purchaser either in Duluth or Superior, Wisconsin. These two cities are adjoining but divided by the state line. It probably was committed to this additional burden by the rules and

without thought thereof. But, assuming that it deliberately so obligated itself to the purchaser, we see no reason why it could not properly and legally assume such obligation arising out of the contingency of the purchaser exercising his option to require the shipment delivered in Superior instead of Duluth. Under the terms of plaintiff's contract, as we construe it, in the light of the authorities herein referred to, it had a contract requiring this car of oats to be delivered to it in Duluth. It was in a position to make delivery there if the oats were up to grade, and they were; and it was in a position to sell such oats, under a contract to deliver in another state, well knowing that it would have to avail itself of the opportunities offered by a common carrier for that purpose. Had it taken actual possession of the car and turned it over to another railroad company to make the interstate shipment from Duluth to Superior, its separate contract would have been completely established. It in substance did not take possession. To have changed railroads the plaintiff would have been put to the annoyance and expense of weighing the car in Duluth to ascertain freight charges which would have entailed the labor and expense of switching the car to a scale track and the consequent delay as well as rebilling. In order to have the defendant Northern Pacific Railway Company make the interstate movement from Duluth to Superior, plaintiff surrendered its bill of lading, and, instead of going through the formality of demanding a new bill of lading covering the interstate movement, merely gave it an order to haul the car to this elevator in Superior. Plaintiff had a short time credit with the Northern Pacific Railway Company, and it made the delivery before asking for settlement. Under the arrangement made, the defendant Northern Pacific Railway Company got the opportunity to make this last haul and with the least possible expense and inconvenience to all parties concerned. The form of the contract, for the purposes of this case, between the parties to the interstate movement is immaterial. The form thereof is not controlling. So. Pac. Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 Sup. Ct. 279, 55 L. ed. 310; Chicago, M. & St. P. Ry. Co. v. Iowa, 233 U. S. 334, 34 Sup. Ct. 592, 58 L. ed. 988.

The plaintiff at all times acted in good faith. When this shipment started no one knew that its ultimate destination was in another state. This method of handling this car was not adopted and carried out to defeat the interstate rate. Had the plaintiff known when this shipment started on its journey that it was to become an interstate shipment and this method resorted to for the purpose of avoiding interstate rates, we would be forced to the conclusion that we could not sustain such conduct. Texas & N. O. R. Co. v. Sabine Tram Co. 227 U. S. 111, 33 Sup. Ct. 229, 57 L. ed. 442; Baer Brothers Mer. Co. v. D. & R. G. R. Co. 233 U. S. 479, 34 Sup. Ct. 641, 58 L. ed. 1055; Baltimore & O. S. W. R. Co. v. Settle, 260 U. S. 166, 43 Sup. Ct. 28, 67 L. ed. 189; Kanotex Refining Co. v. Atchison T. & S. F. Ry. Co. 34 I. C. C. 271; Id. 46 I. C. C. 495; Lumber from Easton, Washington, 39 I. C. C. 188.

The obligation and rights acquired and assumed in the original contract cannot be affected by the second contract which has no terms that have any relation to the original contract that may be said to characterize it as an uncompleted contract, or as one that was made as a part of a continuous interstate shipment  These oats were never, in fact, launched on the way to another state until after they had reached Duluth. McCluskey v. Marysville & N. Ry. Co. 243 U. S. 36, 37 Sup. Ct. 374, 61 L. ed. 578. The definite character of such shipment is fixed when the movement of the commodity has commenced for the purpose of transportation. Such character is usually to be determined from certain elemental facts common in most shipments. These are the intention of the shipper and the carrier as indicated by the bill of lading, the continuity of the movement of the shipment, its delivery under the contract of shipment and other facts present of sufficient probative force to determine the inquiry.

Intention of the shipper is not always controlling, but is in the case now under consideration of great importance, and, together with the other essentials present, conclusively establishes this original shipment as intrastate; and it remained of that character until the commencement of the performance of the new contract, separate and independent from the original, which called for its movement

from Duluth to Superior, which was interstate. State v. Public Service Commission, 269 Mo. 63, 189 S. W. 377; Bracht v. S. A. & A. P. Ry. Co. 200 Mo. App. 655, 209 S. W. 579.

The character of the particular shipment cannot be determined by the decision of the purchaser in Duluth as to where he wanted the car delivered—he was not a party to the contract of shipment and this determination must result from the consideration of other matters as we have indicated.

The judgment is reversed with directions to enter judgment for plaintiff.