145 So. 368

## SCHUSTER'S WHOLESALE PRODUCE CO., Inc., v. TEXAS & P. RY. CO.

### No. 31320.

Oct. 31, 1932.

Rehearing Denied Jan. 3, 1933.

Wise, Randolph, Rendall & Freyer, of Shreveport, and Spencer, Gidiere, Phelps & Dunbar, of New Orleans, for appellant.

Jackson & Smith, of Shreveport, for appellee.

John L. Warren and Laurence K. Hawkins, both of Boston, Mass., amici curiæ, for Fruit Dispatch Co.

ODOM, J.

Plaintiff is a wholesale dealer in produce, including bananas and cocoanuts, with its domicile and place in Shreveport, La., and the defendant is a common carrier of freight in Louisiana. Plaintiff prosecutes the present suit to recover of defendant $4,129.06, alleged to be due for excess charge on freight from New Orleans to Shreveport.

It appears that the interstate rate on fruit shipped from New Orleans, a seaport, to Shreveport, an inland city, is 61 cents per hundredweight, which was the charge made by defendant and paid by plaintiff, and that the intrastate rate on this character of freight is only 50½ cents. Plaintiff contends that defendant's charges should have been based on the intrastate rate, as the shipments were wholly within the state. Defendant contends that the shipments were interstate in character, being part of a continuing movement of

freight from a foreign port through New Orlens to an inland city.

It is not disputed that, if the shipments were intrastate, the defendant's charges were excessive, and that it is due plaintiff the amount claimed. On the other hand, if the shipments were interstate in character, then defendant owes plaintiff nothing.

The trial court held that ·the shipments were intrastate in character, and rendered judgment for plaintiff for the amount prayed for. Defendant appealed.

1. From the above statement it readily appears that the only controverted point is whether tthe shipments of bananas and cocoanuts into Shreveport were intrastate or interstate commerce, and that depends upon the nature of the traffic.

The nature of the traffic is to be determined from the facts and circumstances involved. The case was submitted on an agreed statement of facts which shows that the Fruit Dispatch Company, which is authorized to transact business in New Orleans, is an importer and sold the fruit which comprised these shipments to the plaintiff. The fruit was grown by the Dispatch Company on its plantations in Central America or was acquired by it there not later than the date it was loaded on the vessels in the Central American port. The fruit moved from the Central American port to New Orleans, a port of entry, in ships, and was entered through the customs. All fruit on each vessel, consisting of approximately fifty carloads, was carried on one bill of lading. The importers did not intend to sell the fruit in New Orleans, nor did they intend to sell it at any specific point, but "had the intention to sell it to jobbers and fruit dealers in various places served by the port of New Orleans." Vessels with cargoes belonging to the Dispatch Company arrived in New Orleans almost daily, and the importer was given notice by cable or radio of the approach of each vessel; whereupon the importers arranged with railroads for the necessary cars to be placed on sidings for prompt movement of the fruit on its arrival. When the fruit arrived, it was immediately and rapidly removed from the ships and placed in the waiting cars. Not exceeding six hours elapsed between the arrival of the ships and the loading of the fruit into the waiting cars, and the cars "were given prompt dispatch and quick movement to points beyond New Orleans a few hours after being loaded."

At the time the ships were loaded in Central American ports, the importing owners did not know the precise, ultimate destination of any particular part of the cargo, but did know that the entire cargo was to be unloaded at New Orleans and from there carried on by rail to dealers at· interior points, except about 2 per cent., consisting mainly of overripe fruit not susceptible of further shipment, which was sold to dealers in New Orleans.

The importers had no warehouses or storehouses in New Orleans for the storage of fruit, and it was never intended that any should remain there longer than was necessary to transfer it from ship to cars. They had an established place of business in New Orleans, and, when plaintiff desired to purchase fruit, it communicated with the office there and asked for quotations. Response was made by telephone, and the sales were closed, and confirmation by letter followed. No particular fruit was allocated to plaintiff

until such fruit in kind and quality as ordered was taken from the ship and put into the cars. A bill of lading was then taken out showing the plaintiff as consignee and the importer as the consignor, and the shipment moved the day the purchase was made. All bills of lading, etc., showed on their face that the fruit was received by the rail carrier from a named vessel and had been imported from a foreign country.

Orders for fruit were received and accepted by the importers while the fruit was on the ships between the foreign ports and New Orleans, and, in case sufficient orders to take up the entire cargo had not been received when the ship arrived, "the unsold fruit was loaded into cars and forwarded to points where it was expected that a market would be found and when sales were made while the fruit was rolling, the car containing such fruit was diverted to the purchaser of it."

The stipulation filed shows that the schedule of tariffs on file with the Interstate Commerce Commission authorized defendant to absorb, on import shipments through the port of New Orleans, all port and terminal charges, so as to relieve shippers of any cost of removal of freight from shipside to railroad cars, and that the defendant railroad company for many years has absorbed all port and terminal charges on shipments of bananas made by this importer over defendant's road from New Orleans to all points, whether within or without the state of Louisiana, and that such charges were absorbed on all the shipments involved in this suit.

Under these admitted facts it is manifest that the shipment by rail of this freight from the port of New Orleans to the inland city of Shreveport was but a part of a through shipment from a foreign port. The importer did not intend when it loaded the fruit on board the vessels in Central America, nor did it ever intend, that the fruit should come to rest in New Orleans, except the small fraction of 2 per cent. of it which was usually too ripe for further shipment. As a matter of fact, it did not come to rest there, but was moved immediately after its arrival from ship to waiting cars ordered specially to carry it to its ultimate destination in the interior. This movement from ship to cars did not constitute a break in the shipment. Transshipment at the seaboard was necessary in order that the freight might reach its intended ultimate destination.

The fact that the importers, who were plaintiff's vendors, did not know when the cargo left the foreign port precisely where any part of it would ultimately land does not destroy the interstate character of the shipments. The pertinent fact is that the entire cargo was destined for points beyond the port of entry. New Orleans was never intended to be and was not the destination of the fruit, but these were through continuous shipments from the foreign ports to the points of delivery in the interior. The stipulations filed recite specifically that the importers "had the intention to sell it (the fruit) to jobbers and fruit dealers in various places served by the port of New Orleans."

The identical point here involved was before the Interstate Commerce Commission in the case of Southern Produce Co. et al. v. Denison & Pacific S. Ry. Co. et al., decided in July, 1930, and reported in 165 I. C. C. 423. The Commission found that:

"It is and always has been the intention and practice of the importers to ship bananas to interior points including destinations in Texas; that there is no change in intention during the period between the harvesting of the bananas and their receipt at the port. Prior to the arrival of a ship at Galveston, cars are ordered and are placed for loading. The cargo is loaded directly from the ship into the cars and does not come to rest at the port. Frequently all or part of it is sold to interior dealers prior to the arrival of the ship; and any unsold part is immediately loaded into cars and billed into interior points and is sold while in transit. The assailed rates apply from shipside and under proper interstate tariff authority, and the carriers make allowances for loading the traffic into cars and absorb the wharfage and tollage charges."

It was contended in that case that the shipments from the port to interior points by rail were intrastate in character and that the Commission had no jurisdiction. But the Commission said:

"We find that the traffic is import in character and therefore within our jurisdiction."

This case is on all fours with the one at bar. The facts there found are almost, if not entirely, identical with those of the instant case. On similar facts the Louisiana Public Service Commission held that the movement of bananas from New Orleans to Shreveport was "wholly and entirely import and interstate traffic and that there is no element of intrastate commerce involved whatever." 4th Annual Report, p. 29, Order No. 198, entered April 11, 1924.

These cases are not controlling, of course, but are persuasive. The rulings made are in strict accord with the holding in the leading cases of Railroad Commission of Louisiana v. Texas & Pacific Railroad Co., 229 U. S. 336, 33 S. Ct. 837, 838, 57 L. Ed. 1215, and Texas & N. O. R. Co. v. Sabine Tram Co., 227 U. S. 111, 33 S. Ct. 229, 235, 57 L. Ed. 442, where numerous other similar cases are cited.

In the first of the cited cases, it was held that freight shipped on local bills of lading from interior points to New Orleans, and there to be delivered to the shipper's or consignee's order, "but intended by the shippers to be exported to foreign countries, and treated accordingly by both shippers and carriers, constitute foreign commerce, and as such *are governed as to the intrastate transportation by the tariffs on file with the Interstate Commerce Commission, to the exclusion of the rates established by the state railroad commission.*" (Quotation from the syllabus. Italics ours.)

The facts in the case are precisely the same as those in the case at bar, except that in the cited case the logs and staves shipped from interior points to New Orleans were intended for export, whereas in the instant case the bananas were imported from Central America, destined for sale and delivery at interior points. In the cited case the railroads were the initial carriers and in the case at bar the delivering carriers. The principle involved is precisely the same.

In the cited case, the court, in support of its conclusions, cited Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310, Railroad Commission of Ohio v. Worthington, 225

U. S. 101, 32 S. Ct. 653, 56 L. Ed. 1004, and Texas & New Orleans R. Co. v. Sabine Tram Company, 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442, and said:

"In those cases there was necessarily a local movement of freight, and it necessarily terminated at the seaboard.

"But it was decided that its character and continuity as a movement in foreign commerce did not terminate, nor was it affected by being transported on local bills of lading. The principle enunciated in the cases were that it is the essential character of the commerce, not the accident of local or through bills of lading, which determines Federal or state control over it. And it takes character as interstate or foreign commerce when it is actually started in the course of transportation to another state or to a foreign country. The facts of the case at bar bring it within the ruling. The staves and logs were intended by the shippers to be exported to foreign countries, and there was no interruption of their transportation to their destination except what was necessary for transshipment at New Orleans."

In the Sabine Tram Company Case, supra, lumber was shipped from interior points in Texas to a Texas gulf port under local bills of lading. The lumber was intended for export, and the court held, as it did in Railroad Commission of Louisiana v. Texas & Pacific R. Co., supra, that the traffic over the railroads was interstate. And it was held that, even though the lumber had no definite foreign destination at the time of the initial shipment, the shipment was nevertheless interstate traffic.

In United States v. Erie Railroad Co., 280 U. S. 98, 50 S. Ct. 51, 53, 74 L. Ed. 187, there was involved a shipment of pulp imported from a foreign country. The shipment involved was by rail on local bills of lading by a New York broker from Hoboken, N. J., to Garfield in the same state. The court said that the shipments from Hoboken to Garfield were import in character and that the interstate rate was applicable. It further said that the nature of the shipment was not affected "by the fact that the transaction is initiated or completed under a local bill of lading which is wholly intrastate, * * * or by the fact that there may be a detention before or after the shipment of the local bill of lading.".

Learned counsel for plaintiff say the above-cited cases are not pertinent because each of them except one involves shipments for export and not for import. But, as we have already pointed out, the principle involved is the same. It is a case of distinction without a difference. The pertinent point in the cited cases is that the essential nature of the traffic is the controlling feature in determining whether the shipment is interstate or otherwise and that this essential character is determined at the time the shipment is started for its destination and by ascertaining the intention of the shipper as carried out in the course of the movement.

While other cases are cited, counsel for plaintiff apparently rely chiefly on the cases of Chicago, Milwaukee & St. Paul R. Co. v. Iowa, 233 U. S. 334, 34 S. Ct. 592, 594, 58 L. Ed. 988; Gulf, Colorado & Santa Fé R. Co. v. Texas, 204 U. S. 403, 27 S. Ct. 360, 51 L. Ed. 540; Seaboard Air Line R. Co. v. Lee (D. C.)

14 F.(2d) 439; and Atlantic Coast Line R. Co. v. Standard Oil Co. (C. C. A.) 12 F.(2d) 541, 60 A. L. R. 1456.

A reading of these cases discloses the marked distinction between the facts underlying them and the facts found by the courts in the cases which we have cited as controlling here. In the Chicago, Milwaukee Case the court found that Davenport was a distributing point for coal. It came to rest there. The court said:

"Under the admitted facts, the city of Davenport became a distributing point for coal shipped by the consignor. The certainty in regard to the shipments of coal ended at Davenport. The point where the same was to be shipped beyond Davenport, if at all, was determined after the arrival of the coal at Davenport."

The coal was originally consigned to the coal company at Davenport, and was there held until sales were made. The consignee accepted delivery there, paid the freight to the initial carrier, and assumed full control over it.

The Gulf, Colorado & Santa Fé Case is criticised in a case note found in 60 A. L. R. 1465, as a "border line case" not in accord with the more recent development of the law, and "introducing some confusion into the subject."

In the more recent case of Texas & N. O. R. Co. v. Sabine Tram Co., which we have cited as controlling here, the Supreme Court referred at length to the Gulf & Santa Fé Case, and distinguished it from the case then under consideration. The court said: "It demands, therefore, a careful review." It then proceeded with utmost particularity and at great length to discuss the facts in the Gulf & Santa Fé Case, and held that, while under the facts there found the ruling was correct, the holding should not be considered as controlling in the case then under consideration.

In Seaboard Air Line R. Co. v. Lee, the facts were that an importer bought nitrate of soda in Chile and brought it from there in ships to Wilmington, N. C., the importer's place of business. On arrival, the nitrate was stored or delivered from dock to purchasers to whom quantities had been sold. All contracts for resale provided for deliveries at Wilmington. The purchasers, either from dock or stores, reshipped by rail on new billings to various manufacturers of fertilizer to points both within and without the state, and the court held that:

"Such reshipments were not in continuance of the foreign shipment, *not being within the intention of the importer, whose purpose was fully subserved on delivery to him at Wilmington, but were new and independent movements, with which the importer had no concern,* and that where such a reshipment was to a point within the state it was an intrastate shipment, and subject to established local rates." (Quotation from syllabus. Italics ours.)

In Atlantic Coast Line R. Co. v. Standard Oil Co., supra, the facts were that the Standard Oil Company shipped from its plants at Baton Rouge, La., and Baltimore, Md., quantities of oil and gasoline to Wilmington, N. C., a port on the Atlantic seaboard. The products were carried in its own tank vessels "for the storage thereof and for selling them to customers throughout the state of North Carolina."

The company has at Wilmington six large storage tanks, four for gasoline and two for oil, "with aggregate capacity of between 5,-000,000 and 6,000,000 gallons, together with twenty-three small tanks for lubricating oil, two warehouses of brick construction where various commodities are stored and where some of the products are barreled."

Upon the arrival of the tank vessels, the oil and gasoline is pumped from the tank vessels through pipe lines into the storage tanks, where it is held until orders are received to ship it out. It was found that "one of the objects of the Wilmington plant is to have the products on hand ready for use when and where needed."

The company shipped these products by rail from the Wilmington plant to its customers and filling stations in North Carolina, and the question involved in the case was whether the prevailing intrastate rail rates applied to these interior shipments. It was held that these shipments were not part of a through interstate movement, but were separate independent shipments wholly within the state, and therefore the local rates prevailed.

This was upon the theory, as stated by the court, that the "warehouses at Wilmington constituted a storage depot for the distribution of its products"; "that the cargo shipments from without the state ended at Wilmington; that the large quantities of oil and gasoline brought in by tank steamers, came to rest and lost their identity there in complainant's storage tanks and were mingled with its general stock, and that the shipments from Wilmington were made as a distribution from the general stock and not as a means of continuing the transportation begun with tank steamers. These shipments were therefore independent movements."

This case and others like it, cited by counsel for plaintiff, are readily distinguishable from the case at bar. In the instant case the importer has no storehouses in New Orleans and never kept products on hand there for distribution. New Orleans was a mere halting point for the bananas; they did not come definitely to rest there, but the movement through New Orleans was but a step in a continuous movement from a foreign port to interior points, and the traffic was interstate in character.

For the reasons assigned, the judgment of the lower court is reversed, and plaintiff's demands are rejected and its suit dismissed, at its costs in both courts.