LONG BEACH BANANA DISTRIBUTORS, INC., a California corporation, et al., Appellants,

v.

The ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, Appellee.

CONSOLIDATED PRODUCE CO., a California corporation, et al., Appellants,

v.

PACIFIC ELECTRIC RAILWAY CO., Appellee.

Eugene NELLA, Sam Cancilla and Diego Cancilla, dba Banana King, etc., et al., Appellants,

v.

SOUTHERN PACIFIC COMPANY, Appellee.

Nos. 21345, 21345–A, 21345–B.

United States Court of Appeals
Ninth Circuit.

Feb. 6, 1969.

Victor O. Geretz, (argued) of Hertzberg & Geretz, Jack Oliver Goldsmith, Los Angeles, Cal., for appellants.

Frederic H. Sturdy, (argued) of Gibson, Dunn & Crutcher, John J. Balluff, Matthew H. Witteman, Los Angeles, Cal., for appellees.

Before CHAMBERS, BARNES, HAMLEY, MERRILL, KOELSCH, BROWNING, DUNIWAY, ELY, CARTER and HUFSTEDLER, Circuit Judges.

HAMLEY, Circuit Judge:

In the above-entitled actions, consolidated for trial and appeal, plaintiff banana wholesalers seek the refund of part of the freight charges collected by defendant railroads on the rail movement of bananas wholly within California. The railroads had charged freight rates stated in tariffs filed with the Interstate Commerce Commission, whereas plaintiffs assert that the lower California intrastate rates should have been collected. A summary judgment was entered for defendants and plaintiffs appeal.

The following facts were established by stipulation of the parties. The bananas were grown in either Costa Rica, Panama or Ecuador by subsidiaries of United Fruit Company (United Fruit) or purchased by the subsidiaries from independent producers in those countries. United Fruit purchased the bananas from its subsidiaries f.o.b. steamships at the tropic ports. The bananas were carried by various public carriers (none owned by United Fruit) from the fields to tropic ports where they were immediately transferred by barges to ocean-going ships for carriage to the United States.

Prior to departure of the ships from the tropic ports, the bananas that were to be sold in the United States were consigned to a subsidiary of United Fruit, known as Fruit Dispatch Company (Fruit Dispatch). During the ocean voyage the bananas were covered by negotiable ocean bills of lading showing the producing company in Central America as the shipper, Fruit Dispatch as the consignee, United Fruit as the carrier, and the Port of San Francisco or the Port of Los Angeles as the destination of the shipment.

The original bill of lading accompanied the bananas and was delivered by the ship's master upon the arrival of the bananas at the respective California ports. The bananas were carried on the ships under a schedule of "Banana Freight Rates" on a tonnage basis and freight charges were recorded in United Fruit's books of account.[1] When the bananas entered the United States ports, a Treasury Department Bureau of Customs "Consumption Entry" was filed by Fruit Dispatch showing Fruit Dispatch as the importer of the bananas. Similarly, a "Notice of Arrival" to the United States Department of Agriculture showed Fruit Dispatch as the importer of the bananas.

The bananas were carried on the high seas from the tropic ports to the ports of California in ships chartered by United Fruit under "demise," "time," and "freight" charters. Some of these charters were from subsidiaries of United Fruit and some were from companies having no connection with that company.

---

1. Plaintiffs assert that this was merely a matter of inter-company bookkeeping.

The bananas involved in this litigation were carried in thirty-five ships which included registries in six different countries.

There were no storage facilities for bananas at the San Francisco and Los Angeles docks. Prior to the arrival of the ships the defendant rail carriers were requested to place the required number of cars at dockside for loading. Upon arrival of the ships, the bananas were immediately unloaded into the waiting rail cars. Bananas which had already been sold were immediately moved on to wholesalers within the state of California. The remainder were either held aboard the railroad cars awaiting disposition, or were started away from the harbor pending sale in transit. The trial court found, however, that it was the intention of the parties from the time the bananas were grown in the tropics that they were destined for points beyond the port of entry.

The bananas were sold to the plaintiff wholesalers under a memorandum of sale which provided for delivery at seaboard and required the purchasers to pay all freight charges. The plaintiff wholesalers paid Fruit Dispatch for the bananas. The latter company prepared rail bills of lading showing itself as the shipper and one of the plaintiffs as the consignees. It was stated in the bills of lading that the bananas were imported on a named ship from a designated port in Central or South America.

Prior to 1927 bananas destined for California had been transported by vessel to United States Gulf ports and then moved by rail. The importation of bananas through United States West Coast ports commenced in 1927. To provide commodity rates tailored to this particular traffic, shipside import rail rates were established to various specified destinations in California, Nevada, Oregon, Idaho, Montana and Utah. These rates, which we will refer to as "Tariff 197" rates, were published in various tariffs of the Pacific Freight Traffic Bureau, now known as the Pacific Southcoast Freight Bureau, and were filed with the Interstate Commerce Commission (Commission).

Whether, under these facts, the interstate or the intrastate rates should have been applied to the bananas sent by rail wholly to points within California depends upon the construction to be placed upon section 1(2) (a) of the Interstate Commerce Act (Act), 24 Stat. 379 (1887), as amended, 49 U.S.C. § 1(2) (a) (1964). In the margin is set out subparagraph (a) in its context with the relevant parts of sections 1(1) and (2).[2]

2. "§ 1. Regulation in general; car service; alteration of line.

"(1) Carriers subject to regulation.

"The provisions of this chapter shall apply to common carriers engaged in—

"(a) The transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment; or

"(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water—

"From one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only insofar as such transportation or transmission takes place within the United States.

"(2) Transportation subject to regulation.

"The provisions of this chapter shall also apply to such transportation of passengers and property, but only insofar as such transportation takes place within the United States, but shall not apply—

"(a) To the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one State *and not shipped to or from a foreign country from or to any place in the United States as aforesaid,* * * *." (Emphasis supplied.)

It will be observed that, under what we will call the "and not" clause at the end of section 1(2) (a), the provisions of the Act relating to railroad rate regulation, with exceptions not here relevant, do not apply to the rail transportation of property wholly within one state (here California) unless the property is "shipped to or from a foreign country from or to any place in the United States as aforesaid, * * * ."

The bananas in question were moved from foreign countries to places in the United States, but were they shipped "as aforesaid," within the meaning of the "and not" clause? Plaintiffs argue that in order for the foreign part of the through movement to be "as aforesaid," within the meaning of the "and not" clause, it must be by common carrier, and that here the foreign part of the through movement of the bananas in question was by private carrier. Defendants, on the other hand, argue that the words "as aforesaid" do not mean that the foreign part of the movement must be by common carrier, and that, in any event, the foreign part of this through banana movement was by common carrier.

In granting summary judgment for defendants, the district court made no determination as to whether the movement of the bananas from Central and South American ports to San Francisco and Los Angeles was by private or common carrier. Presumably, then, the district court was of the view that this was immaterial, and that the "and not" clause applies whether the foreign part of the movement is by common or private carrier. The first question presented on this appeal is the correctness of this view. If this is correct, and if these bananas were "shipped" within the meaning of the "and not" clause, we must affirm even if plaintiffs are right in contending that the waterborne part of the movement was by private carrier.

If the decision of this court in Chicago, M. St. P. & P. Ry. v. Campbell River Mills Co., 9 Cir., 53 F.2d 69, is controlling here, it would be necessary to rule that the district court erred in holding, by implication, that the "and not" clause applies whether the foreign part of the through movement was by common or private carrier. That case involved the private rail movement of logs by the owner over its private rail line from points in British Columbia, Canada, to a railroad common carrier in the state of Washington, followed by a common carrier rail movement wholly within Washington to Bellingham. At this point, the logs were dumped into Bellingham Bay and ninety percent of them were then towed by the owner of the logs to its mill at White Rock, British Columbia.

In holding that the "and not" clause did not apply because the foreign part of this movement was by private carrier, and therefore the intrastate rates govern, this court said in the *Campbell River* case:

"The use of the word 'such' in connection with 'transportation' [section 1(2), immediately preceding subparagraph (a)] would seem to imply that the transportation which is meant is transportation by common carrier; and the phrase 'as aforesaid' similarly indicates that goods 'not shipped from a foreign country to the United States' *by a common carrier* would not come under the purview of that chapter. Since subsection 1 deals entirely with defining 'common carriers' subject to the provisions of the chapter, it follows that the phrase 'as aforesaid' qualifies the 'shipping' referred to in subsection 2 as being shipping by common carrier." 53 F.2d at 72. (Emphasis in original.)

Applying this same rationale in the case now before us, it would be necessary to hold that, unless the waterborne part of the banana movement was by common carrier, the "and not" clause of section 1(2) (a) is not applicable and therefore the intrastate rates should have been charged for the rail transportation wholly within California. It would then be necessary to remand the cause to the district court to determine whether the water-

borne movement of the bananas was by common or private carrier.[3]

Defendants seek to distinguish *Campbell River* because of the substantial difference in the facts of that case and the one now before us. But the court there construed the statute here in question, and that construction is binding upon us unless that decision is overruled.

In our opinion, the *Campbell River* court incorrectly construed the "and not" clause of section 1(2) (a).

We agree with the view expressed in *Campbell River* that the word "such" in connection with "transportation," as those words appear in section 1(2) immediately preceding subparagraph (a), imply that the transportation there referred to is transportation by "common carrier." It will be observed that section 1(1) of the Act describes the *carriers* subject to regulation under Part I of the Act, and section 1(2) describes the *transportation* subject to regulation. Under section 1(1), the carriers subject to regulation are common carriers engaged in the kinds of transportation described in section 1(1) (a) and (b), between points of the kind described in the last paragraph of section 1(1).

Thus, having described, in section 1(1), the kind of transportation in which a common carrier must be engaged in order for such carrier to be subject to Part I regulation, it was not necessary to repeat that description in section 1(2), which specifies what *transportation*, as distinguished from what *carriers*, are subject to Part I regulation. All that was necessary was to *incorporate*, by reference, the description of transportation contained in the immediately preceding section 1(1). This was accomplished at the outset of section 1(2) by referring to "such" transportation. And since

"such" transportation, as described in section 1(1), is limited to transportation by common carriers, the same limitation is applicable in section 1(2), in describing what transportation is subject to Part I regulation.

In *Campbell River*, as the above-quoted portion of that opinion indicates, the court then went on to state that "the phrase 'as aforesaid' similarly indicates that goods 'not shipped from a foreign country to the United States' by a common carrier would not come under the purview of that chapter [Part I of Act]." It is at this point that we disagree with *Campbell River*.

In construing the "and not" clause of section 1(2) (a), we are not concerned with whether the foreign part of a through movement comes under the "purview" of the Act. Subparagraph (a) provides that transportation wholly within one state is not subject to Commission regulation, but the "and not" clause added thereto specifies an exception. Application of this exception would make transportation wholly within one state subject to Commission regulation, but it would not make the foreign part of the through movement subject to Commission regulation. Both paragraphs (1) and (2) of section 1 specifically limit Commission regulation of carriers and transportation to such transportation as takes place within the United States. Since the foreign part of the through movement, as described in the "and not" clause, would in no event be subject to Commission regulation, there is no compelling reason, as in the case of the phrase "such transportation" at the outset of section 1(2), why that foreign movement must be limited to common carrier operations.

Another consideration leads us to the same conclusion. In *Campbell River*, the

---

3. Defendants argue that we can determine this on the basis of the stipulated facts, but plaintiffs assert otherwise. Since the district court did not decide the matter we do not know whether, in the exercise of its discretion, the district court would have granted summary judgment

for defendants on that ground. It might have preferred to let that point go to trial. Under the circumstances, the district court should have the first opportunity to deal with the question if it becomes necessary to reach it.

court correctly determined that the term "common carrier," as used in section 1 (1) and made applicable by reference in section 1(2), does not refer to the common law concept of "common carrier," but to that term as defined in Part I of the Act. As indicated by section 1(1) (a) and (b), the term, as used in Part I, refers only to common carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment; and to common carriers engaged in the transportation of oil or some other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water.[4]

It will be seen from the foregoing that no waterborne movement of property from a foreign country to the United States could be a "common carrier" movement, within the meaning of Part I of the Act, unless the vessel engaged in such movement was used under common control, management or arrangement with a common carrier railroad for a continuous carriage or shipment.

■ We can take judicial notice of the fact that few, if any, ocean-going vessels are used under a common control or management with a common carrier railroad. And where, as is usually the case, and is the case here, the water carrier undertakes to maintain its own carriage as distinct from that of the connecting common carrier railroad by having its separate contract, its independent rate, and its direct instructions from the shipper as to its own transportation, there is no common "arrangement" with the connecting rail carrier in the sense

intended by section 1(1) (a). Mere practical continuity in the transportation is not enough. See United States v. Munson Steamship Line, 283 U.S. 43, 47, 51 S.Ct. 360, 75 L.Ed. 830.

It follows that, for all practical purposes, the *Campbell River* construction of the "and not" clause would almost entirely preclude the application of that clause where the foreign part of the through movement is by water carrier rather than by railroad.[5] Having in view the fact that a substantial amount of the foreign imports into ports of the United States, and destined for points within the port state, arrive by vessel, it is difficult to believe that Congress intended the "and not" clause to have application only where the foreign part of the movement is by railroad. Certainly the same policy considerations which led Congress to bring under federal regulation railroad transportation wholly within one state where the property is shipped by railroad to or from a foreign country from or to a place in the United States, would dictate a similar result where the foreign part of the shipment is by vessel.

In our opinion, the phrase "as aforesaid" appearing at the end of the "and not" clause in section 1(2) (a), refers back to the language of subparagraph (a) immediately preceding the "and not" clause. This immediately preceding language provides that the "transportation" dealt with in subparagraph (a) is transportation of property "wholly within one State." Thus the phrase "as aforesaid" in the "and not" clause which follows makes it clear that the exception which that clause spells out applies in the case of property shipped to or from a foreign country from or to any place in the United States, where the domestic part

---

4. Section 1(3) (a) of the Act provides that the term "common carrier," as used in Part I of the Act, "shall include all pipeline companies; express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation as aforesaid as common carriers for hire."

5. Since the court in *Campbell River* was not concerned with the application of the "and not" clause in a case involving a waterborne movement, it is not surprising that it did not perceive this effect of the statutory construction which it adopted.

of the movement takes place "wholly within one State."

So construed, the phrase "as aforesaid" does not operate to limit the foreign part of this total movement to movement by common carrier. This being the case, inclusion of that phrase in the "and not" clause does not preclude application of that clause where the foreign part of the movement is by private water carrier.

The view just expressed finds support in the case of Texas & N. O. R. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913). That action was brought by the shipper of lumber to recover claimed overcharges and penalties.

Sabine Tram Company was engaged in the manufacture of lumber at its mill in Ruliff, Texas. W. A. Powell Company, Limited, was engaged in buying lumber for export to Europe through the ports of Sabine and others in Texas. The Powell Company bought a quantity of lumber from Sabine Tram Company to be delivered f.o.b. cars at Sabine, Texas, or elsewhere in Texas at seller's option.

The lumber was shipped entirely within the state of Texas by rail to Sabine. The railway company knew when the freight charges were collected that the lumber was to be exported to Europe. The lumber was loaded into vessels chartered by the Powell Company. The seller, Sabine Tram, contended that the shipment by rail, being entirely within one state, came directly within the exclusion in section 1(2) (a) (wholly within one state) and that the lower intrastate rates should apply. The Court said:

"The determining circumstance is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce, not its mere accidents, should determine. It was to supply the demand of foreign countries that the lumber was purchased, manufactured and shipped, and to give it a various

character by the steps in its transportation would be extremely artificial. Once admit the principle and means will be afforded of evading the national control of foreign commerce from points in the interior of a State. There must be transshipment at the seaboard, and if that may be made the point of ultimate destination by the device of separate bills of lading the commerce will be given local character, though it be essentially foreign." (227 U.S. at 126, 33 S.Ct. at 234)

The "to or from"—"from or to" language in subsections (1) and (2) (a) indicates that exports and imports are to be treated alike under the Act. Yet except for the export-import distinction, *Sabine Tram* is identical to this case. In both cases the domestic leg was by rail common carrier wholly within one state. In both cases the foreign leg was by chartered vessels which were not "common carriers" as that term is used in Part I of the Act. The ruling in *Sabine* that interstate rates were applicable is thus persuasive if not controlling authority here.

Plaintiffs place considerable reliance upon Pennsylvania R. R. v. Public Util. Comm. of Ohio, 298 U.S. 170, 56 S.Ct. 687, 80 L.Ed. 1130, in urging us to hold that the "and not" clause applies only where the foreign part of the through movement is by common carrier.

That case involved the private shipment of coal on the owner's railroad from Pennsylvania to Ohio, followed by a further movement of the coal by a common carrier railroad wholly within Ohio. The court held that the Ohio transportation was not subject to Commission jurisdiction because the movement of the coal from Pennsylvania to Ohio was by private carrier.

The only exception to the provision that transportation wholly within a state is not subject to Commission regulation is that contained in the "and not" clause of section 1(2) (a). Paragraph (a) and its "and not" clause were not applicable in the *Pennsylvania Railroad* case be-

cause no foreign movement of property was involved. Thus, the Supreme Court in the *Pennsylvania Railroad* case had no occasion to construe the "and not" clause, and did not do so. Quite to the contrary, the Court there pointed out that section 1(2) (a) stated an exception to federal regulation of common carriers by rail which was inapplicable in that case. See 298 U.S. at 174, 56 S.Ct. 687.

In the *Pennsylvania Railroad* case, the transportation within Ohio would have been subject to Commission regulation if it had been part of a through movement from another state by common carrier, for then it would have been interstate commerce by connecting common carriers.[6] It was therefore necessary for the Supreme Court, in the *Pennsylvania Railroad* case, to determine whether the part of the transportation which crossed a state line was by common or private carrier. The conclusion that it was private carriage was accordingly dispositive, since it established that there was no interstate carriage by common carrier railroad.

Thus the problem dealt with in the *Pennsylvania Railroad* case is entirely different from that presented in our case.

■ We must also consider the meaning to be attached to the word "shipped," as it appears in the "and not" clause. The terms "shipped" or its present tense "ship" are not defined in the Act. However, the words "ship" or "cause to be shipped" ordinarily apply to transportation by common carrier. See Arnold v. United States, 8 Cir., 115 F.2d 523, 527. And in the state court phase of the *Campbell River* litigation, the Supreme Court of Washington held that the transportation of the logs there involved, by the owner of the logs, from points in British Columbia to a point in the state of Washington was not a "shipment." The court based this conclusion not only on the fact that the foreign part of the log movement was by the owner, but because, as to that part of the movement, there was no contract of carriage, no bill of lading, and no consignor or consignee. See State ex rel. Chicago, M. St. P. & P. Ry. v. Department of Public Works, 149 Wash. 129, 270 P. 300, 301.[7]

■ Where, as here, the statutory term is not defined in the Act, the term should be given that meaning which comports with the intent of Congress. In *Arnold, supra,* the court was able to refer to legislative history which clearly revealed that the evil which the statute there in question was designed to remedy pertained only to common carrier operations.[8]

No legislative history bearing upon the meaning of "shipped," as it appears in the "and not" clause of section 1(2) (a) of the Act, has come to our attention. Nor do we find anything helpful in the statutory context in which the term appears.

The general effect of subparagraph (a) of section 1(2) is to exclude from Commission regulation transportation wholly within one state. But Congress apparently thought that, at least in some instances where common carrier transportation wholly within a state is part of a continuous movement from a foreign country to a point of destination within a single state, the national interest dic-

---

6. Regulation under Part I of the Act is aimed at common carriers exclusively. Pennsylvania R.R. v. Public Util. Comm. of Ohio, 298 U.S. 170, 174, 56 S.Ct. 687, 80 L.Ed. 1130. Connecting carriers by railroad, if utilized to provide interstate transportation by their joint operation, are subject to Commission regulation. See section 1(1) of Act.

7. In our case, on the other hand, there were, as between the owner of the fruit and the water carriers, contracts of carriage, bills of lading, and consignees and consignors, unless, as plaintiffs urge, the separate corporate entities of United Fruit Company and its various subsidiaries which operated the freighters, are to be disregarded.

8. The *Arnold* court was also required, as it stated, to give application to the rule that criminal statutes are to be strictly construed. Since the Interstate Commerce Act is not a criminal statute, that rule is inapplicable here.

tated that Commission jurisdiction over the part wholly within a state should attach.

We are unable to perceive why that national interest would be any less in the case where the foreign segment is by private carrier than where it is by common carrier. Insofar as any legitimate regulatory function is concerned, the economic impact on competing transportation agencies, competing wholesalers, and the general public is the same whether the foreign segment is by common or private carriage. If, in the case where the foreign segment is by common carrier, federal regulatory control of the rail rates of carriers transporting goods wholly within one state is considered preferable to state control, we see no reason why Congress would have thought otherwise where the foreign segment is by private carrier.[9]

We therefore conclude that "shipped," as used in the "and not" clause, includes movement by private carrier as well as common carrier.

While it is not of controlling significance, it is worth noting that at all times during the thirty-year period since the importation of bananas through the ports of San Francisco and Los Angeles to interior California destinations began defendant railroads have charged and plaintiff banana wholesalers have, without question until now, paid on the basis of interstate Tariff 197. There have heretofore been numerous proceedings before the Commission involving Tariff 197,

and most of the plaintiffs were parties to most of those proceedings. In none of those proceedings did these plaintiffs ever claim that the rates filed with the Commission did not apply.[10]

Under circumstances almost identical with those of this case, except that different United States ports were involved, two courts have held that the rail movement of bananas wholly within one state was subject to interstate rates. See Schuster's Wholesale Produce Co. v. Texas & P. Ry., 176 La. 167, 145 So. 368, 369–371; United States v. Illinois Cent. R.R., E.D. La., 230 F. 940, 941. A similar conclusion was reached by the Commission on closely analogous facts. See Southern Produce Co. v. Denison & Pac. Suburban Ry., 165 I.C.C. 423, 428. The precise question of whether, under the "and not" clause, the foreign part of the through movement of bananas had to be by common carrier was not raised in these cases, but this itself is not without significance.

Moreover, in the Commission case referred to above, that agency made it clear that the fact that private water carriers were involved made no difference.[11] The Commission has ruled similarly where some commodity other than bananas was involved.[12]

Another consideration which tends to support the conclusion we have reached is that the construction which plaintiffs would place on the "and not" clause would present serious practical difficulties.

In the case of *imports*, the theory which plaintiffs seek to apply would re-

---

9. With reference to the case now before us, if plaintiffs are correct in asserting that all of the waterborne movement of bananas was by private carrier, it would seem that private waterborne carriage of bananas has a far greater impact on the American economy, and thus there is a far greater need of federal regulation thereof, than in the case of the waterborne movement of bananas by common carrier.

10. Moreover, the California Public Utilities Commission, which has jurisdiction over the regulation of intrastate railroad rates in California, has never claimed jurisdiction over the banana rail movement in question.

11. The Commission said, at page 425 of its decision in 165 I.C.C.:

"Bananas are imported regularly and continuously throughout the year and reach the ports in cargo lots, usually in ships owned and operated by the producing and importing interests. * * *"

12. In Pittsburgh Coal Producers' Ass'n v. Ashland Coal & Iron Ry., 126 I.C.C. 309, 314, the Commission said:

"The transportation from the mine to the port being interstate or foreign in character it is subject to our jurisdiction under the general provisions of section 1, irrespective of the mode of transportation beyond the port."

quire the buyers and rail carriers to determine at the time the rail transportation is desired, and at their peril (witness these lawsuits), whether the vessels in which the commodity reached the United States were private or common carriers. In the case now before us, for example, plaintiffs in effect charge that when the rail carriers transported the bananas they should have known that the waterborne transportation, although involving bills of lading and all the other outward indicia of a common carrier movement, was actually by private carrier.

It is not reasonable to expect that the rail carriers could have ascertained the facts as to this before transporting this perishable commodity. Nor is it reasonable to place upon the rail carriers in this case the burden of proving in subsequent law suits that the vessels were common carriers, or the necessity of disproving plaintiffs' assertion that they were private carriers.

The practical difficulty of applying plaintiffs' theory in the case of *exports* is even greater. For example, a rail carrier which accepts a commodity at Fresno, California, for shipment to San Francisco and ultimate export to a foreign country, would not know whether to charge the intrastate or interstate rates because it would not know whether the continuing movement would be by common or private carrier.[13] If it "guessed wrong" on this, the rail carrier would become subject to civil actions such as this, or criminal action by the Government.

We accordingly hold that the interstate rail rate was here applicable whether or not the waterborne movement of the bananas was by private or common car-

rier. Chicago, M. St. P. & P. Ry. v. Campbell River Mills Co., 9 Cir., 53 F.2d 69, is overruled insofar as it would require a contrary result.[14]

Affirmed.

13. Under plaintiffs' theory this determination could be made only if the rail carrier knows: (1) what ship is going to carry the product; (2) who holds title to such ship and whether the title holder is the same as the exporter; and (3) even if documents or other evidence indicate that the exporter is not the title holder to the ship, the rail carrier would still have to determine whether the doctrine of *alter ego* should be applied.

14. The result reached in *Campbell River* may have been entirely correct, in view of the fact that the tract from which the logs were taken was partly within and partly without the United States and there was no way of determining which, or how many, of the logs actually came from Canada.